Randy JARNIGAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–97–00445–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 9, 2001.

Jani J. Maselli, Houston, for appellant.

William J. Delmore, III, Houston, for appellee.

Panel consists of Justices LEE, AMIDEI, and HUTSON–DUNN.*

### OPINION

NORMAN LEE, Justice (Assigned).

Randy Jarnigan, appellant in this case, was indicted for engaging in organized criminal activity by committing theft of more than $200,000. TEX. PEN.CODE ANN. § 71.02 (Vernon 1994 & Supp.2000). He

---

* Senior Justices Lee, Amidei, and Hutson– Dunn sitting by assignment.

was convicted by a jury, which sentenced him to thirty years' confinement. Appellant brings nine points of error. He first contests the legal and the factual sufficiency of the evidence to support his conviction (points 1 and 2). He next contends the trial court erred: in not instructing the jury that certain witnesses were accomplices (points 3, 4 and 5); (6) in admitting a chart into evidence before the jury; (7) in not quashing the indictment; (8) in denying his motion to sever; (9) in telling the venire that they could consider the defendant's failure to call witnesses. We affirm.

## BACKGROUND

Appellant was convicted for his part in a scheme which staged automobile accidents between October 9, 1993 and January 19, 1995 in order to collect insurance proceeds. He was jointly tried with Tan Kien Tu, Drs. Thomas Gemoets and Alfonso Gonzalez, and Leighann Phan. Tu was the owner of two medical clinics and was the alleged ringleader of the organization. Drs. Gemoets and Gonzalez worked at those clinics and treated persons involved in the staged accidents. Phan was an employee at one of the medical clinics. Tu, Gonzalez, and Gemoets have also appealed their convictions to this court, as follows: *Tan Kien Tu v. State*, 61 S.W.3d 38; *Gonzalez v. State*, 14–97–00745–CR, 2001 WL 893699; *Gemoets v. State*, 14–97–00174–CR, 2001 WL 893524.

The State relied on eight particular accidents to establish a theft of $218,562.55 in insurance proceeds; appellant was attorney of record on three of these accidents. He negotiated recoveries of $77,281.41 from three different insurance companies in the accidents. The "victims" received no part of the settlement proceeds. All the participants were paid only a few hundred dollars cash for their participation in the automobile wrecks. Someone other than the "victims" signed the insurance settlement checks and the subsequent checks made out to them by appellant. Appellant's checks to the participants were all cashed at a drive-in grocery store by unknown persons.

## THE EVIDENCE

Because appellant challenges the sufficiency of the evidence to support his conviction, we will set forth the relevant facts in some detail.

Oscar Phu testified he acted as Tu's "agent" and gave an overview of the scheme. Phu said he started out referring legitimate cases to Tu and progressed, at Tu's direction, to staging accidents. As the "agent," Phu had to provide both defendants and plaintiffs, so that the operation could make money from both sides of the accident. He said Tu gave him powers of attorney and data sheets for the "victims" to sign, and that Tu determined which attorneys got which "victims." Phu also would check to be sure that the "victims" were insured and would sometimes buy the insurance policies for the cars himself. Finally, when Phu decided to work for a ring engaged in similar operations, he trained Angie Mong as his replacement "agent." He said that client-passengers would get one-third of the money, the attorneys would get one-third of the money and the doctors would get one-third of the money. He said Tu would get kickbacks of fifty percent from both the doctors and from attorneys.

Charles Patberg, a Harris County sheriff's deputy, participated in one of the staged wrecks. He said he met with Angie Mong, Michael Ford, Kenneth Johnson and Mary Pressley at a restaurant. (Johnson had tipped Patberg as to the existence of the ring.) Ford gave him

money to purchase insurance on a vehicle. Patberg said that when the insurance went into effect, he contacted Mong, who "set the wheels in motion to have the accident." His car was designated as the "girl car," the car which would be hit and which would have a driver and three passengers in it at the time; the "boy car" would have only a driver and would do the colliding. The accident, which was videotaped by police, took place on a freeway feeder road; when the collision was done, he said, he was instructed to honk the horn twice so that Mong would call the police. The driver of the "boy car" admitted to police that he ran a stop sign and was ticketed. After the collision, the participants met at another restaurant, where Mong had the occupants of the "girl car" fill out forms, including a power of attorney. Patberg said the power of attorney was blank when he signed it, and that Mong didn't say who his lawyer would be. Patberg was given $600 to distribute among the passengers of the "girl car." Patberg said this accident was typical of the enterprise as described by Mong.

After the accident, the "victims" were directed to go to the clinic where Gemoets, one of appellant's codefendants, was practicing. There Patberg told the receptionist that they were "sent there by Angie to see the doctor;" his blood pressure was checked and one of his shoulders was X-rayed. Patberg was then ushered in to see Gemoets, who asked him if he had been in an accident and recommended he take an over-the-counter medication for the pain. Patberg said Gemoets never got out of his chair and never examined him.

After that visit, Patberg said, he and the other officers went to another restaurant to eat. While they were there, Mong told them there had been a mix-up, that they needed to go over to another doctor, and offered a $25 bonus if they would do so.

She drew them a map and told them to ask for "Leighann" but did not make an appointment. So the officers went to that office and told the receptionist, "Angie sent us, and we need to see Leighann." The officers were ushered out of the regular waiting room and into an office where Leighann Phan was waiting. Phan had them sign in and then sign "about 30" forms. At that point, Mong showed up and started going over the paperwork. Patberg said Gonzalez had him do basic flexing and stretching exercises and asked him if he needed a prescription for the pain. When Patberg said yes, Gonzalez wrote him two prescriptions for narcotic medication.

Patberg testified he went on to conduct surveillance on three other "accidents" set up by the group. Appellant was the attorney of record on one of those accidents, which included an undercover officer, James Howard, as one of the passengers. Patberg said he never saw any of the money which may have been paid as a part of any insurance settlement in his staged accident.

Thomas J. Pearson was an attorney who employed Jarnigan when Tu began bringing accident cases to his office. Pearson said Tu was introduced to him as a paralegal who worked for another law firm; Tu said he had substantial contacts with body shop owners who referred cases to him, that he was dissatisfied with the results obtained by his employer and that he wanted a better lawyer. Soon after the meeting, Pearson agreed to work with Tu on his referrals.

At that time, appellant was working for Pearson as an associate. Pearson oversaw the handling of the cases brought in by Tu while appellant oversaw day-to-day operations. The information sheet for each case would come from Tu, who would also have the clients sign a power of attorney. The

firm would then send a demand letter to the relevant insurance company, along with a copy to the client, and would send the treating physician a letter of protection guaranteeing payment.

Pearson said he originally paid Tu an hourly wage, but it soon became clear to him that Tu wanted a share of the attorney's fees. Pearson refused. As a result of this impasse, Tu was not paid any money for seven months. Pearson finally relented and gave him a payment of about $30,000, a figure which included a settlement Pearson obtained for Tu's daughter.

Pearson said he instructed appellant to reject cases and return files in which insurance companies sought to take sworn statements from claimants. He reasoned that it was more important to maintain the firm's reputation with the insurance companies than to press cases which the companies found questionable enough to require examination under oath. In light of this cautious attitude, it was not long before Pearson began to have problems with cases brought in by Tan Tu. In one case, Pearson sent a demand letter, with a copy sent to a claimant; the claimant's father called asking who he was, denied that Pearson was his son's attorney, and denied that his son had been involved in an accident. In a second case brought in by Tu, the insurance company refused to pay because they believed the accident to be staged; Pearson returned that file. In a third case, an insurance adjustor called to point out inconsistencies in the evidence. Pearson said he examined the evidence and became convinced that a double impact had occurred, contrary to the claimant's version of events. He told appellant to send that case back. Finally, Pearson rejected a case in which the claimants appeared to be driving from Beaumont to Houston three or four times per week to see a doctor. Pearson said he found this unbelievable.

After the double-impact case, Pearson said he called Tu into his office and asked him for an explanation. Tu told Pearson that he would have to discuss the matter with his "agent." Pearson said he "threw a fit" and pressed Tu to explain what kind of "agent" he was talking about. Tu did not explain. After this meeting, Pearson said he told appellant that the firm could not be involved in cases like the double-impact case.

Later, Pearson said he was contacted by a representative of the state bar's unauthorized practice of law committee, who told him that someone was settling cases using his name. This prompted Pearson to hire a private investigator. It also prompted him to undertake a fresh look at the cases which Tu was bringing into the office. He said an impromptu statistical analysis showed that more than 80 percent of the cases brought in by Tu had either three or four claimants involved, a circumstance which he found suspicious. He said this review prompted him to instruct appellant to take new precautions when dealing with Tu's cases because he suspected fraud. Eventually Pearson was sending 30 percent of the cases brought in by Tan Tu back as suspicious. Pearson said that normally he would not expect to reject any cases as suspicious.

Finally, Pearson said he told Tu that he was rejecting all the cases he brought in, and that he did not want any more cases from him. Tu kept coming around and kept bringing cases, and Pearson, who acknowledged a substance abuse problem at the time, took some of these cases.

One case which came in during this period involved Peter Taormino, who said he was introduced to Mong by an acquaintance. Mong asked Taormino if he would like to get his truck fixed and make some

"quick money." She explained that they staged car wrecks and that he would have to go to a doctor and tell them he was injured. Taormino had been in a previous accident and his truck had been damaged by an uninsured driver. On October 9, 1993, Lawrence Grimes and Tammy Cooney went with Taormino and participated in a staged auto accident in which no new damage was done to Taormino's truck. The trio went to Dr. Gemoets' office, and Taormino told the receptionist that Angie had sent them. Taormino signed several forms in blank, and all three "victims" went into Gemoets' office together. Taormino said he and his friends were not examined, but were told where they were injured; Gemoets marked an anatomical chart where they were hurt.

After his office sent out a letter of representation on that case, and after speaking with an insurance adjustor, Pearson said he told appellant that a person had a better chance of being injured on a roller coaster than of being hurt in the Taormino accident. Pearson said he told appellant to close the file and send it back. In spite of this, letters on the Taormino case continued to be sent out under his name. One handwritten notation in the file, "Run offers by Tan Tu," was identified by Pearson as being in appellant's handwriting.

The record shows that State Farm paid appellant a total of $14,817.59 to settle this accident claim. The checks were deposited into appellant's trust fund account. Checks were written by appellant to Taormino, Grimes and Cooney for five-sixths of the settlement amount; all three checks were endorsed and cashed at Lee Drive–In Grocery. Taormino said he did not know appellant and never signed any checks that were made out to him.

Soon Pearson was avoiding his own office in order to avoid Tu and eventually moved out. Pearson admitted that he was afraid of Tu. When he told Tu he was leaving his office behind, he paraphrased Tu's reaction as, "Fine. Just don't f--- dup the deal with Jarnigan. Let Jarnigan take the cases. You go on down the road." Appellant remained behind in the office with the Tu cases. Pearson estimated that as much as 75 percent of his docket may have been Tu cases at that point. Pearson said he returned several months after he moved out to find his name still on the door, and that in some cases letters were still being sent out over his signature. Pearson demanded that his name be removed from the door and denied signing any letters after he moved out.

Pearson testified that when he left, he felt he had lost control of his office to Tu. Pearson said he told appellant that there were so many cases coming from Tu that could not pass the "smell test" that he could no longer "plausibly deny" that the source of the cases was tainted.

Brian Vaclavik, a fraud investigator with the Harris County district attorney's office, analyzed appellant's trust fund account and testified as an expert witness. He said that although appellant's contract with the accident "victims" entitled him to one-third of the recovery, he appeared to keep only half that amount. Appellant would write checks for five-sixths of the amount recovered out of his trust fund account; these checks would then be cashed at one of two check-cashing stores. Vaclavik used that information to infer that appellant was paying kickbacks to Tu.

Robert Bruso testified he participated in a staged accident, along with Deborah Pittman, Brenda Tindol and Angela Scruggs. He said he got $500 from Angie Mong for his participation and $500 from her when the case settled. He said he signed a power of attorney for Mong before the accident occurred, that he never met appellant and did not know that he

had an attorney. Documents introduced into evidence showed that State Farm Insurance Co. wrote four $5,500 checks, made out jointly to appellant and each of the four participants, to settle the claim. These checks were deposited to appellant's trust fund account. Appellant then wrote checks for $ 4,584 to each participant; each check was cashed at Lee's Drive–In Grocery. Bruso testified he did not sign the check and did not receive a check from appellant.

Michael Borque was in an accident on February 7, 1994, with his wife Mary Ramirez and Brenda Tindol. Although appellant was on record as his attorney, Borque said he never met appellant, did not sign any checks, did not sign any releases, and did not know the case had settled. He said he was paid "a couple of hundred dollars" for his participation by Angie Mong, and that was all the money he ever expected to see from his participation.

The insurance company issued checks of $7,500 each, payable to Jarnigan and the three participants. These checks were released after appellant forwarded signed releases, one of which bore Borque's purported signature. The releases were notarized by Tu. The released checks were deposited into appellant's trust fund account. Appellant wrote checks for $6,250 to Borque and the other participants which were cashed at Lee's Drive–In Grocery.

Other testimony came in from an accident for which appellant was attorney but which did not result in a recovery. Richard Wilson testified one of his friends duped him into allowing his vehicle to be used in an "accident." His participation was arranged by Mary Pressley, another accident "victim", and an undercover officer, James Howard, was a passenger. After the "accident" was staged, and after the police left, Wilson was told to talk with "Angie." She gave him an envelope to give to his friend and told him to see Dr. Gemoets. Wilson said Gemoets merely talked to him and wrote him some prescriptions, which he threw away.

Wilson said he did not get paid for participating in his accident, so he called the insurance company to find out about his claim. He said he did not know he had a lawyer until "Angie" told him appellant was his lawyer, that he would be talking to some people, and that he needed to remember a "script" of how the accident happened. At her direction, he went to appellant's office and gave a statement to an insurance investigator. Wilson said the interview went badly. After the interview, he accused appellant of participating in insurance fraud; appellant stated that he "didn't see it as that." Wilson said he never got any money to fix his car.

Howard, the undercover officer in the "wreck," said he was paid $50 for his participation. He said he met with "Angie" about an hour before the "accident," where he signed release forms and powers of attorney. Right after the accident, Howard said Angie told him to see Gemoets, and that Gemoets barely examined him before prescribing painkillers. Some time later, Howard said he got a message that he needed to see an appellant. Just prior to that meeting, Howard said he met with Angie, who urged a version of events which was contradicted by the accident report.

Mary Pressley was a passenger in the same accident. At some point after the accident, Angie told her to go to appellant's office to give a statement; she was told she would be meeting with an insurance representative and was told what to say. At appellant's office, Pressley met up with appellant, Wilson, and David Perry, who had also been in on the staged wreck. Appellant introduced himself but did not talk about the terms of their representa-

tion, only about the accident. He told her to tell the truth, but that he would signal her if he didn't want her to answer a question.

The meeting with the insurance representative was to take place in a conference room. Wilson went in first with appellant. When they came out, Pressley said appellant was in a rage, saying that "Angie had screwed up" and she "needed to get her shit straight."

Elizabeth LaRoe was the claims representative with State Farm Insurance who took statements in the case. She said Wilson called her several times to get updates on his case. When she told him he needed to call his attorney, he denied having an attorney. Based on this and other factors, LaRoe said, she decided to take statements in the case. She said appellant was combative in the interview and would not let Wilson answer questions about the mix-up.

Hartley Hampton, a board-certified trial attorney, testified as an expert on law firm practice for the state. After reviewing appellant's files, Hampton said he found it suspicious that there were 337 plaintiffs referred by Tu, and that these files were docketed separately. He said he had never known of a situation where it was profitable to docket the files separately according to the source of the referral.

Hampton also examined the three accidents in which appellant was attorney of record. He noted that although appellant was entitled to one-third of the settlement amount under his contract with the "victims," he routinely wrote checks to his clients for five-sixths of the amount settled, which he said indicated appellant was splitting his fee. Hampton said the cases were "carbon copy cases" in which the injuries were apparently calculated to maximize the recovery of Personal Injury Protection benefits from the policies. He

said the cases often lacked the most basic documentation, including in some cases a contract employing appellant or authorizations to view the medical records made the basis of the settlement.

## SUFFICIENCY

In his first two points of error appellant questions the legal and factual sufficiency of the evidence to support his conviction. He argues, first, that the evidence against his client does not show "guilty knowledge" sufficient to support the jury's verdict; second, that the evidence does not show that appellant was guilty of stealing $200,000. We disagree.

Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See Jackson v. Virginia*, 443 U.S. 307, 315–16, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 320, 99 S.Ct. at 2789; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App.1993). The evidence is examined in the light most favorable to the jury's verdict. *Jackson*, 443 U.S. at 320, 99 S.Ct. 2781; *Johnson*, 871 S.W.2d at 186. All of the evidence is considered by the reviewing court, regardless of whether it was properly admitted. *Johnson*, 871 S.W.2d at 186; *Chambers v. State*, 805 S.W.2d 459, 460 (Tex.Crim.App. 1991).

In conducting this review, the appellate court is not to re-evaluate the weight and credibility of the evidence, but act only to ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex.Crim.App.1993); *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.

Crim.App.1988). In making its determination, the jury can infer knowledge and intent from the acts, words, and conduct of the accused. *Johnson v. State*, 32 S.W.3d 388, 393 (Tex.App.—Houston [14th Dist.] 2000, no pet. h.)(citing *Dues v. State*, 634 S.W.2d 304, 305 (Tex.Crim.App.1982)).

█ A defendant commits the offense of engaging in organized criminal activity if, intending to establish, maintain, or participate in a combination or in the profits of a combination, he commits or conspires to commit one or more of the listed offenses, including theft. Tex. Pen.Code Ann. § 71.02(a)(1) (Vernon 1994 & Supp. 2000). A "combination" is defined as three or more persons who collaborate in carrying on criminal activities, although: (1) the participants may not know each other's identities; (2) membership may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations. *Id.* § 71.01(a). A determination of guilt in regard to organized criminal activity requires two ingredients: (1) an intent to participate in a criminal combination, and (2) the performance of some act, although not necessarily criminal in itself, in furtherance of the agreement. *Barber v. State*, 764 S.W.2d 232, 235 (Tex. Crim.App.1988). Because direct evidence is rarely available to prove the existence of an agreement, circumstantial evidence is sufficient and is almost always needed. *Carlson v. State*, 940 S.W.2d 776, 779 (Tex. App.—Austin 1997, pet. ref'd). It is permissible to infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal. *McGee v. State*, 909 S.W.2d 516, 518 (Tex.App.—Tyler 1995, pet. ref'd).

█ This court also has jurisdiction to review the factual sufficiency of the evidence. *Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App.2000). Our review begins with the presumption that the evidence is legally sufficient. *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996). We must determine "whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *Johnson*, 23 S.W.3d at 11. Evidence is factually insufficient if: 1) it is so weak as to be clearly wrong and manifestly unjust, or 2) the adverse finding is against the great weight and preponderance of the available evidence. *Id.* In our review, we must be careful not to intrude on the jury's role as the sole judge of the credibility of the witnesses or the weight to be given their testimony. *Id.* at 9; *see also Santellan v. State*, 939 S.W.2d 155, 164 (Tex.Crim.App.1997).

Appellant was indicted and convicted of organized criminal activity—theft over $200,000, a first-degree felony. He contends, first, that the evidence is insufficient to show he was aware of the fraudulent nature of the cases he was working on, and that the evidence does not show his intent to join with the combination.

█ We have no difficulty finding the evidence sufficient to show appellant had the requisite mental state. Pressley testified that appellant was in a "rage" after Wilson was examined by an insurance investigator and exclaimed that "Angie had screwed up" and "needed to get her shit straight." Angie, of course, was hiring the "victims" which appellant was representing. We believe this outburst alone shows an awareness of the combination, a willingness to participate and to further the purpose of that combination. There is other evidence, of course; the releases forwarded by appellant and notarized by Tu in the

Borque case, which Borque said he did not sign, certainly showed appellant was involved in some way with the apparent head of the combination. Pearson told appellant that he thought the Taormino case was fraudulent and told him to close the case and return it. Instead appellant negotiated a settlement in the case. This case included a handwritten note in Jarnigan's handwriting with the notation, "Run offers by Tan Tu."

Further, three different witnesses, participants in three different accidents in which appellant was involved, testified they were paid to stage a false accident. In all three cases appellant negotiated their dubious claims to a settlement with the insurance company. In all three cases checks were issued, jointly payable to appellant and the testifying witness; although none said they endorsed a check from an insurance company, all three were negotiated with their purported signatures and deposited into appellant's trust fund account. Appellant kept some of these funds. Appellant then wrote checks to these witnesses, which the witnesses never saw and which were cashed at the same location by persons unknown. We believe the evidence is both legally and factually sufficient to show that appellant intended to participate in a combination and participate in the profits, and that he was aware of the nature of the enterprise.

■ In the second prong of his sufficiency attack, appellant argues that the indictment in his case alleged the completed offense of theft over $200,000. Since the accidents for which appellant was attorney only recovered $77,281.41, he argues, the evidence is insufficient to sustain his conviction.

■ The sufficiency of the evidence to support a conviction is measured not by the jury charge actually given, but rather by the elements of the offense as defined by a hypothetically correct charge. *See Curry v. State*, 975 S.W.2d 629, 630 (Tex. Crim.App.1998). "Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App.1997).

The State asserts that a "hypothetically correct" charge under *Malik* could charge that appellant acting as a party together with other members of the combination committed theft of the total amount of over $200,000.00. *See Malik*, 953 S.W.2d at 240. Based on the decisions in *Malik*, a hypothetically correct jury charge for this case would have applied the law of the parties to the facts, "is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. *See also Blanco v. State*, 962 S.W.2d 46, 46 (Tex.Crim.App.1998); *Nesbitt v. State*, 958 S.W.2d 952, 954 (Tex.App.—Beaumont 1998, no pet.). In *Nesbitt*, the court of appeals followed *Malik* and found that the hypothetically correct jury charge for the case would have applied the law of parties to the facts. Therefore, the court held that the evidence in the case was legally and factually sufficient to show that appellant was guilty as a party to the underlying offense of murder while engaging in organized criminal activity. *Id. See also Nguyen v. State*, 21 S.W.3d 609, 613 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd).

In three companion cases involving convictions for engaging in organized crime to commit murder, the Beaumont Court of Appeals held that the parties charge ap-

plied to the appellants' acts causing the death of a victim, and not to his intent to participate in a combination. *See Campbell v. State*, 18 S.W.3d 914, 920 (Tex. App.—Beaumont 2000, pet. ref'd); *Brumfield v. State*, 18 S.W.3d 921, 927–928 (Tex. App.—Beaumont 2000, pet. ref'd); *Armstrong v. State*, 18 S.W.3d 928, 932–933 (Tex.App.—Beaumont 2000, pet. ref'd.). *See also Johnson v. State*, 32 S.W.3d 388, 392–393 (Tex.App.—Houston [14th Dist.] 2000, no pet.).

After the instruction on a combination, a hypothetically correct charge could authorize the jury to find appellant guilty if he committed theft as a principal or as a party by aiding or encouraging other members of the combination in the commission of theft of money over the total value of $200,000. This would allow the jury to apply the law of parties to the underlying offense of theft, and not to appellant's intent to participate in a combination.

We find that applying the law of parties to the facts in this case is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability and adequately describes the particular offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240. We therefore hold that the evidence is sufficient to sustain appellant's conviction on this subpoint and overrule his first and second points of error.

## ACCOMPLICE WITNESSES

In his third point of error appellant contends the trial court erred by not instructing the jury that Pressley was an accomplice witness as a matter of law; in his fourth point, he contends the jury should have been instructed that Pressley was an accomplice witness as a matter of fact. We disagree.

▮▮▮ A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed. TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 1979). The rationale behind this rule is that accomplice witnesses may often have incentives to lie, such as to avoid punishment or to shift the blame to another. *Blake v. State*, 971 S.W.2d 451, 454 (Tex.Crim.App.1998).

▮▮▮ A person is considered an accomplice if he or she could be prosecuted for the same offense as the defendant or for a lesser included offense. *Id.* at 454–55. In other words, a person is an accomplice if there is sufficient evidence connecting them to the criminal offense as a "blameworthy participant." *Id.* at 455; *Matthews v. State*, 999 S.W.2d 563, 565 (Tex.App.—Houston [14th Dist.] 1999, pet. ref'd). The test is whether there is sufficient evidence in the record to support a charge against the witness alleged to be an accomplice. *Blake*, 971 S.W.2d at 455. If the evidence clearly shows that the witness was an accomplice as a matter of law, the trial court must so instruct the jury. *Id.* However, if the evidence on the issue is conflicting, the court should present the matter for decision to the jury. *Id.*

▮▮▮ We must now examine the record for evidence that Mary Pressley participated in the crime charged against appellant. *See id.* Patberg testified that he first learned of the insurance fraud ring from Kenneth Johnson, an informant on another matter. Patberg said that he asked Johnson to involve himself in the group and inform on its activities. Mary Pressley was Johnson's girlfriend. She testified that she was first approached about participating in a staged accident by a Michael Ford, but she told him she was not interested because it was illegal. Johnson,

however, decided to participate in the staged accident. Pressley managed to contact Patberg and told him of Johnson's plan. Patberg testified that he called Johnson and told him: "Listen, if you have the staged accident, you're on your own. We don't have any control over it."

Pressley further testified that she decided to go ahead and participate in the accident so that she "could let Charlie and them know how they did these wrecks." She specifically stated that she was not doing it for the money, and, in fact, she did not directly receive any money for participating.[1] Pressley then became a paid informant for the sheriff's office. She managed to infiltrate the insurance fraud ring and report her observations to deputy Patberg, who himself later participated in a staged accident.

The evidence does not support the contention that Pressley could have been prosecuted for the same offense as appellant or even a lesser included offense. See Blake, 971 S.W.2d at 454–55. A person commits the offense of engaging in organized criminal activity if, intending to establish, maintain, or participate in a combination or in the profits of a combination, he or she commits or conspires to commit one or more of the listed offenses, which include theft. TEX. PEN.CODE ANN. § 71.02(a)(1) (Vernon 1994 & Supp.2000). A person commits theft if he or she unlawfully appropriates property with the intent to deprive the owner of the property. Id § 31.03(a).[2]

■■■ It is also well-settled that a "volunteer" working on behalf of a criminal investigation is not an accomplice witness so long as he or she does not bring about

the crime but merely intends to obtain evidence to be used against those committing the crime. See Parr v. State, 606 S.W.2d 928, 929 (Tex.Crim.App.1980); Alexander v. State, 168 Tex.Crim. 288, 325 S.W.2d 139, 140 (1959); see also Bacon v. State, 762 S.W.2d 653, 656 (Tex.App.— Houston [14th Dist.] 1988, pet. ref'd)(witness, a private citizen, bought heroin from defendant during police investigation).

Pressley specifically testified that she participated in the staged accident because she wanted to be able to help gather information for the sheriff's office on the insurance fraud ring. She did not participate in order to share in the ill-gotten proceeds of the crime. Her testimony was fully supported by that of Deputy Patberg, whom she contacted before she participated in the accident and who was fully apprised of her planned activity. No contradictory evidence was submitted on this issue. It is clear that Pressley did not possess the requisite intent for the commission of the charged crime; she was attempting to obtain evidence to be used in a criminal prosecution, and she was not a "blameworthy participant." See Blake, 971 S.W.2d at 455; see also Bogany v. State, 36 S.W.3d 527, 529–30 (Tex.App.—Houston [1st Dist.] 2000, pet. granted), judgment vacated w.r.m. September 27, 2000 (finding no evidence in the record to suggest witnesses had the intent to participate in the criminal combination described in indictment); Mize v. State, 915 S.W.2d 891, 895 (Tex. App.—Houston [1st Dist.] 1995), pet. ref'd, 922 S.W.2d 175 (Tex.Crim.App.1996)(holding that evidence did not demonstrate witness's intent to commit theft as a matter of law but conflicting evidence on intent did

1. The payment for her participation apparently went to Kenneth Johnson.

2. Theft can be considered a lesser included offense in a charge for organized criminal

activity to commit theft. See Smith v. State, 36 S.W.3d 908, 910 (Tex.App.—Houston [1st Dist.] 2001, pet. ref'd).

raise fact issue for jury). Furthermore, there was no evidence suggesting that Pressley brought about the crime. *See Parr*, 606 S.W.2d at 929. The trial court did not err in refusing to instruct the jury that Mary Pressley was an accomplice witness as a matter of law or a matter of fact. Accordingly, we overrule points of error three and four.

In his fifth point of error appellant contends the trial court erred by not instructing the jury that Pearson was an accomplice witness as a matter of law. Appellant requested and was refused this instruction; instead, the jury was instructed that it must decide whether Pearson was an accomplice. Appellant contends that Pearson's testimony was the only evidence showing that appellant had reason to be suspicious of the Tu cases; since Pearson was not designated as an accomplice witness, he contends, and his testimony was crucial, reversal is mandated. We disagree.

 If a witness is indicted for the same criminal episode for which the appellant is standing trial, or if the evidence clearly shows that appellant was an accomplice as a matter of law, failure to so instruct the jury that the witness is an accomplice as a matter of law is error. *Harris v. State*, 645 S.W.2d 447, 454 (Tex.Crim.App.1983). Pearson was not indicted for his participation in the scheme; further, the fact that Pearson was granted immunity in order to overcome any Fifth Amendment privilege he might assert does not render him an accomplice as a matter of law. *See Moulton v. State*, 508 S.W.2d 833, 836 (Tex.Crim.App.1974). And we do not believe that the evidence clearly shows that Pearson was an accomplice. Pearson testified that he rejected cases which he found suspicious and eventually abandoned his practice rather than continue to take cases from Tu. The only case which Pearson admitted participating in, and which was the subject of appellant's indictment, was the Taormino case. Pearson testified that he told appellant to close the Taormino case; instead, appellant negotiated the case to a recovery. Appellant's uncontradicted testimony negated the state of mind necessary to be guilty of participation in the combination and raised a fact issue as to whether he was an accomplice witness. When there is a question whether a witness is an accomplice, it is proper to submit that issue to the jury, and this is sufficient even though the evidence appears to preponderate in favor of the conclusion that the witness is an accomplice as a matter of law. *Brown v. State*, 640 S.W.2d 275 (Tex.Crim.App.1982). That was done here. We therefore find the trial court did not err in failing to instruct the jury that Pearson was an accomplice as a matter of law. We overrule appellant's fifth point of error.

## CHART ISSUES

In his sixth point of error appellant contends the trial court erred by permitting the prosecution to use a chart during opening argument before the contents of the chart were proven up by testimony. The chart in question measured 36″ by 70″ and contained 22 photographs of people and buildings. The subjects depicted included the five suspects on trial, other actors not on trial such as Angie Mong, and the exteriors of locations which were implicated in the case. Appellant contends he was prejudiced because this poster allowed the jury to "link appellant to the other members" of the organization before hearing evidence. At the end of trial, the trial court admitted into evidence the chart "only for the purpose of assisting, if it does in any way, in trying to follow the testimony."

It is well established that the trial court has the discretion to permit the use of visual aids and charts in the summarizing of evidence. *Markey v. State*, 996 S.W.2d 226, 231 (Tex.App.—Houston [14th Dist.] 1999, no pet.). Appellant's complaint is actually twofold: that the chart was improperly displayed to the jury during opening argument, and that it was improperly admitted as evidence near the end of the trial. We will take each of these in turn.

We believe the trial court did not err in permitting prosecutors to use the chart during opening arguments. This was a large and complicated case, with five defendants, forty-four prosecution witnesses, and twenty-two volumes of trial record spread over more than three weeks. The judge did not exceed the limits of his discretion in determining that the use of the chart might help the jury by minimizing the confusion inherent in such a large volume of information. *See Barnes v. State*, 797 S.W.2d 353, 357 (Tex.App.— Tyler 1990, no pet.). The admission of the chart into evidence is more problematic. On the one hand, this court has held that admission of a chart summarizing evidence was error because it "constitutes no proof of any fact in issue. It has no inherent probative value and it can rarely provide any significant assistance to the trier-of-fact." *Markey*, 996 S.W.2d at 231. *Markey* was a prosecution for driving while intoxicated, and the chart admitted in that case simply listed the symptoms of intoxication which the arresting officer had observed in the defendant. On the other hand, in a footnote, the *Markey* court noted that "in highly technical or complex cases, a summary of the evidence may be admissible in evidence to aid the jury in organizing the data." *Id.* at 231 n. 3. This is such a case. We therefore find that the trial court did not abuse its discretion in this instance by admitting the chart into evidence with a proper limiting instruction. Appellant's sixth point of error is overruled.

## MOTION TO QUASH

In his seventh point of error appellant argues the trial court erred in overruling his motion to quash the indictment. Prior to trial, appellant filed a motion complaining that his indictment was not specific enough to enable him to defend against the state's allegations. On appeal, his specific complaint is that the indictment alleged that appellant committed theft, in a conclusory fashion, without sufficient details to permit him to defend. We will treat this as a complaint that the indictment should have alleged the manner and means by which theft was committed.

A motion to quash should be granted only when the language concerning the defendant's conduct is so vague or indefinite as to deny him effective notice of the acts he allegedly committed. *De-Vaughn v. State*, 749 S.W.2d 62, 67 (Tex. Crim.App.1988). In an organized crime case, the State need not allege the manner and means by which the underlying theft was committed. *Crum v. State*, 946 S.W.2d 349, 359 (Tex.App.—Houston [14th Dist.] 1997, pet ref'd); *see also Lucario v. State*, 658 S.W.2d 835, 837 (Tex.App.— Houston [1st Dist.] 1983, no pet.). Unless a fact is essential to notice, the indictment need not plead the evidence relied upon by the State. *Livingston v. State*, 739 S.W.2d 311, 321 (Tex.Crim.App.1987). An indictment that tracks the language of the statute is legally sufficient and the State need not allege facts that are merely evidentiary in nature. *Id.* Here the indictment tracked the language of section 71.02; therefore, the trial court did not err in refusing to quash the indictments. We overrule appellant's seventh point of error.

## MOTION TO SEVER

■ In his eighth point of error, appellant contends the trial court erred in denying his motions to sever his case from his co-defendants. He argues that the disparity of culpability between the defendants and the high probability of confusion by the jury severely prejudiced him.

> Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, *and evidence introduced thereon,* it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

TEX.CODE CRIM. PROC. ANN. art. 36.09 (Vernon 1981 and Supp.2000) (emphasis added).

Appellant failed to offer any evidence to the trial court to support his claims of prejudice and jury confusion. At the pretrial hearing on the motions to sever, the trial court advised the parties it would carry the motions with the trial and allow the parties to urge them during the trial. Appellant argues the trial court's error in not granting a severance was a continuing one, and the decision should be viewed in light of all the evidence, not just what was discussed prior to trial.

■ The mere allegation that prejudice will result is not evidence of or sufficient showing of prejudice required under Article 36.09. *Mulder v. State,* 707 S.W.2d 908, 915 (Tex.Crim.App.1986). A timely motion for severance under article 36.09 must be made prior to the announcement of ready for trial. *Foster v. State,* 652 S.W.2d 474, 477 (Tex.App.—Houston [1st Dist.] 1983), *aff'd,* 693 S.W.2d 412 (Tex. Crim.App.1985). Furthermore, if no evidence is offered in support of the motion to sever, the trial court does not err in overruling the motion. *See Sanne v. State,* 609 S.W.2d 762, 776 (Tex.Crim.App.1980); *Crum,* 946 S.W.2d at 366; *Fisher v. State,* 681 S.W.2d 202, 206 (Tex.App.—Houston [14th Dist.] 1984, pet. ref'd). Thus, because appellant failed to provide any evidence to support his motion to sever, we hold the trial court did not err in denying severance.

Accordingly, appellant's eighth point of error is overruled.

## COMMENTS BY THE TRIAL COURT

■ In his ninth point of error appellant contends the trial court erred by telling the venire that they could in fact consider a defendant's failure to call witnesses in its deliberations. Appellant contends this was a harmful comment on the constitutional rights of the accused. The trial judge explained to the jury panel before voir dire commenced that the burden of proof is on the State to prove the defendants' guilt beyond a reasonable doubt and that the defendant does not have to testify. He further explained: "[i]f the evidence shows that there were witnesses available to the defense and they didn't call them [. . .] that might be considered by you, but the defense doesn't have to put on anything." After a break, counsel for one of the co-defendants objected to the judge's comments on the jury being able to consider the failure to call certain witnesses, but the court overruled the objection. Later, during voir dire examination, a defense

attorney asked a veniremember whether she understood that a defendant does not have to bring any evidence and the burden of proof is on the State. The veniremember stated that she understood, but she would want to hear some evidence. The trial judge then further explained that although a defendant does not have to testify, "his failure to call those witnesses who might know something about the facts is not placed in the same category as the failure of the defendant to testify." Again, a defense attorney objected and moved for a mistrial, and the court overruled the objection. At trial, appellant did not call any witnesses on his behalf.

On appeal, appellant contends that the judge's comments were impermissible comments on the weight of the evidence in violation of article 38.05 of the Texas Code of Criminal Procedure and that they were reasonably calculated to injure the defendants' rights and benefit the State. *See* TEX.CODE CRIM. PROC. ANN. Art. 38.05 (Vernon 1979); *Clark v. State*, 878 S.W.2d 224, 226 (Tex.App.—Dallas 1994, no pet.). It is well established that a prosecutor may comment on the failure of a defendant to call witnesses and may even argue that the reason for the failure was the defendant's knowledge that the testimony would be unfavorable. *See Albiar v. State*, 739 S.W.2d 360, 362–63 (Tex.Crim.App.1987). The trial judge's comments, therefore, did not impermissibly comment on the weight of the evidence but merely helped define the parameters of the conclusions that the jury could draw from the evidence. In short, he was explaining the applicable rules of criminal law. *See Williams v. State*, 834 S.W.2d 502, 505 (Tex.App.—Fort Worth 1992, pet. ref'd). Accordingly, we find that the court's remarks were not reasonably calculated to harm the appellant or to benefit the State. This point of error is overruled.

The judgment of the trial court is affirmed.