Affirmed and Memorandum Opinion filed July 7, 2009








Affirmed
and Memorandum Opinion filed July 7, 2009.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-08-00305-CR

____________

 

KOLADE AFOLABI ADEYANJU, Appellant

 

v.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 232nd
District Court

Harris County, Texas

Trial Court Cause No. 1131864

 



 

M E M O R A N D U M   O P I N I O N

A jury convicted appellant of engaging in organized
criminal activity and sentenced him to twenty five years= incarceration. 
In four issues, appellant contends that (a) his right to a unanimous jury was
violated because the jury charge was submitted in the disjunctive, (b) the
evidence is legally and factually insufficient to establish that he acted in a
combination to carry on criminal activities, and (c) the evidence is factually
insufficient to prove the value of the proceeds from his criminal activities
exceeded $100,000.  We affirm.    








I.  BACKGROUND

Nigerian informant Victor Nwalie reported to U.S. Postal
Services Inspector Matthew Boyden that appellant asked him to help negotiate
several checks.  Boyden requested that Nwalie get more information so Boyden
could investigate the legitimacy of Nwalie=s tip.  Nwalie
agreed to set up a meeting with appellant to see if Boyden could catch
appellant with the checks.  

On June 15, 2006, appellant and Olawie Raji met Nwalie in
the parking lot of an apartment complex in Houston.  They were joined by Etim
King, who arrived separately.  Appellant and Raji sat in the front seat of
appellant=s vehicle; King and Nwalie sat in the back.  Boyden
watched from a distance, but no recording was made of the meeting.  At some
point during the meeting, Nwalie called Boyden=s cell phone and
pretended that Boyden was someone who worked at a bank who could cash the
checks.  After the meeting ended, Nwalie left in his vehicle, appellant and
Raji left in appellant=s vehicle, and King followed them in his
vehicle.  Nwalie contacted Boyden and told him that he had seen the checks in
appellant=s car, so Boyden stopped appellant and King before
they left the apartment complex parking lot. 








Boyden searched appellant=s car.  He
recovered a magazine containing three un-negotiated checks from the pocket
behind the passenger seat.  Two of the checks were blank; another was payable
to APatrick Brennan@ for $4,600; all
three checks were purportedly from an account owned by ARase Safier.@  Boyden also
recovered a phone list with the name and phone number for AEtim@ and seven others,
passport photos of appellant, a $1,000 money order purchased from a Kroger
supermarket, a Western Union receipt for money sent to Nigeria, and latex
gloves.  Boyden found the following items on appellant=s person: (1) a
Social Security card issued in the name of Patrick Brennan; (2) a bank deposit
receipt for $8,900 to an account that had been opened using the personal
information of Patrick Brennan; (3) pieces of paper with names, account
numbers, dates, Social Security numbers, and dates of birth of various people;
and (4) ATM and Visa check cards issued by Chase Bank to appellant.  Raji had
an ATM balance inquiry receipt from the Brennan account and pieces of paper
with another person=s name, address, and banking information
on his person when he was arrested.[1]


In addition, Boyden found several items in King=s car: a piece of
paper containing bank information belonging to an individual named Rafe Safier;
a social security card issued to a AMyron Smith@; money order
receipts from Kroger; and various addresses, telephone numbers, and figures
written on sheets of paper.[2] 
Boyden also recovered a datebook belonging to another of King=s associates,
Adesola Imoru, which contained the phone number for Styles Checks, the company
that had printed the Rase Safier checks.  

After recovering this evidence, Boyden began tracing the
accounts associated with the checks and other identifying information.  His
investigation lead to the discovery of the following facts.

The checks found in appellant=s vehicle had been
ordered on a legitimate bank account belonging to New Jersey resident Rafe
Safier.  Safier reported that numerous unauthorized checks, totaling over
$118,000, had been drawn on his account between May and June 2006.[3] 
These checks were close in numerical sequence; the design on all the checks
contained characters from the Shrek movies and all misspelled Safier=s first name as ARase@ (the ASafier checks@).[4] 
The three checks recovered from appellant=s car matched the
Safier checks. 








One of the Safier checks had been deposited by Imoru to her
own account on June 2, 2006.[5] 
Imoru said that King gave her the Safier check to deposit into her account. 
After the check was deposited to her account, King contacted appellant to get
his assistance in purchasing money orders.  Appellant met Imoru and King at a
Kroger store; appellant and Imoru purchased money orders from this store on
June 6, 2006, using Imoru=s debit card.  

Another of the Safier checks was payable to Houston
resident Richard Guderyon for over $19,000.[6] 
An on-line bank account was opened using Guderyon=s identifying
information, but Guderyon did not open this account or give anyone else
permission to open this account.  Further, he did not know Safier and had never
received a check from him.  Other Safier checks had been made payable to
individuals named Catherine Davies, Matthew Kasunga, Ogochukwu Ogbanzu, Luevisa
Dickey, Chanell Showers, a business named Josephs Graphic Designs, and Patrick
Brennan.  At the time of appellant=s trial,
investigation into several of these individuals or businesses was still
ongoing.








Turning to information concerning Patrick Brennan,
appellant opened a bank account using Brennan=s identifying
information on April 26, 2006 (the ABrennan account@).  Although the
initial deposit was only $20, between May 19 and June 20, 2006, numerous larger
deposits were made into this account, including a Safier check for $4,800
deposited on June 7 and another Safier check for $8,900 deposited on June 13. 
ATM and debit card transactions totaling over $10,000 were processed through
the Brennan account during this same period of time.  Surveillance photos from
several ATM transactions showed appellant withdrawing funds from, depositing
funds to, or making balance inquiries on this account during the
late-May/early-June time frame before his arrest.  Further, New York resident
Brennan reported that in April 2006, unknown persons attempted to open five to
six credit card accounts in his name.  He also reported that, during this same
time period, an unknown person or persons Amoved money around@ in an account he
had set up with the proceeds from the sale of his home without his knowledge or
permission.

In addition to these uncontested facts, several individuals
testified and a significant volume of documentary evidence, including numerous
bank statements, copies of checks, ATM surveillance photos, and cell phone
records, was admitted into evidence at appellant=s trial.  Further,
Postal Inspector Boyden testified regarding his experience investigating
advanced fraud and identity theft schemes.  He provided a flow chart linking
appellant, Imoru, King, and Raji (among others) to a fairly complicated check
negotiation scheme.  According to Boyden, King seemed to be controlling the
Safier account because he had all the original information for it.  He
testified that, in his experience, such a check cashing scheme usually involves
people who control the original source, such as a Ahijacked account,@ people who
recruit others to participate in the scheme, and others who are willing to
receive or cash the checks, called Acollusive account
holders.@  Boyden stated
that deposits of some of the other Safier checks had been traced to other
individuals, including Catherine Davies, Tuka Siafa, and Ayodeji Abiola, and
that his investigation was still ongoing.

Boyden described the activity in the Brennan account as
follows:

The bottom line is this account was fraudulent from the inception.  It
was funded with nothing, almost nothing but Mr. Safier[=s] checks totaling approximately a
little - - I believe a little bit over $20,000.00.  Those funds were withdrawn
very quickly during what we call point of sell [sic] transactions.  Gas
stations, grocery stores, ATM withdrawals for cash as well as the purchasing of
money orders which once you purchase a money order you can immediately convert
somewhere else to cash.  So it just further dilutes the ability to trace those
funds but the funds were very quickly withdrawn in a matter of days.








After the State rested, appellant testified in his
defense.  He explained that he came to the United States from Nigeria in 2002
to attend school.  At first, his parents provided him money, but they became
financially unable to do so.  He started working, but was informed by  AImmigration@ that he was not
eligible to work because of his immigration status as a student.  He then got
married and applied to have his immigration status changed.[7] 
However, before his immigration status was approved, King suggested that he
could use someone else=s information to get a job.  Appellant
stated he used Patrick Brennan=s information to apply for some jobs and
set up a bank account so he could get his paychecks deposited directly into the
account.  According to appellant, King approached him to see if he could cash a
check for him because King did not have a bank account; King offered appellant
money in exchange for cashing the check.  King gave him one of the Safier
checks, and appellant deposited it into the Brennan account.  

He admitted depositing another Safier check into this
account, but insisted that he then gave King all of Brennan=s identifying
information back and refused to cash any more checks for him because he had
become suspicious of King.  He further acknowledged that he made several
purchases and withdrawals using the debit card from this account, but explained
that King asked him to do so.  He also admitted accompanying King and Imoru to
purchase money orders at Kroger.  Further, he could not explain how the
information regarding various other people=s credit cards,
bank accounts, and identifying information got into his car, or how the $8,900
receipt from a deposit to the Brennan account and a Social Security card in
Brennan=s name were
discovered on his person.  He also insisted that King brought the magazine
containing the checks into his car on the day he was arrested. 

After both sides rested and closed, the jury found
appellant guilty of engaging in organized criminal activity and sentenced him
to twenty-five years= incarceration in the Texas Department of
Criminal Justice, Institutional Division.  The trial court rendered judgment on
the jury=s verdict and also
recommended that appellant pay $118,000 in restitution to Safier=s bank.  This
appeal timely ensued.       

                                                              








II.  THE JURY CHARGE

In his first issue, appellant contends the trial court erred
in submitting the predicate offense of money laundering in the disjunctive,
thus violating his right to a unanimous jury verdict.[8] 
As is relevant here, the jury charge provided as follows:

A person engages in organized criminal activity, if, with the intent to
establish, maintain, or participate in a combination or in the profits of a
combination, he commits money laundering.

. . .

A person commits the offense of money laundering if the person
knowingly:

(1)     acquires or maintains an interest in,
conceals, possesses, transfers, or transports the proceeds of criminal
activity; or

(2)     facilitates a transaction involving the
proceeds of criminal activity.

(emphasis
added).  This definition tracks the money laundering statute.  See Tex. Penal Code Ann. ' 34.02(a)(1), (2)
(Vernon Supp. 2008). 

Our review of jury charge error involves a two‑step
process. Ngo v. State, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). 
First, we must determine whether error occurred.  Id.  If error exists,
we must then evaluate whether sufficient harm resulted from the error to
require reversal of the conviction.  Id.  The Texas Constitution
requires a unanimous verdict in felony cases.  Tex. Const. art. V, ' 13; Tex. Code Crim. Proc. Ann. art. 36.29
(a) (Vernon Supp. 2005).  However, a defendant=s right to jury
unanimity is not violated when the jury is disjunctively instructed on
alternate means or theories of committing the same offense.  Jefferson v.
State, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006); Martinez v. State,
129 S.W.3d 101, 103 (Tex.  Crim. App. 2004).  








The statute in question here provides that a person commits
the offense of engaging in organized criminal activity Aif, with the
intent to establish, maintain, or participate in a combination or in the
profits of a combination . . . , he commits or conspires to commit one or more
of the following . . . any offense under Chapter 34 or 35[.]@  Tex. Penal Code Ann. ' 71.02(a)(10)
(Vernon Supp. 2008).  As is applicable here, chapter 34 of the Texas Penal Code
criminalizes the offense of money laundering, which includes, among other
things, (a) acquiring or maintaining an interest in, concealing, possessing,
transferring, or transporting the proceeds of criminal activity or (b)
conducting, supervising, or facilitating a transaction involving the proceeds
of criminal activity.  Id. ' 34.02(a)(1),
(2).   Finally, Acriminal activity@ includes any
offense classified as a felony under Texas or federal law.  Id. ' 34.01(1)(A).  

To find appellant guilty of engaging in organized criminal
activity in this case, the jury had to first conclude that appellant engaged in
money laundering.  However,
appellant argues, with no citation to authority, that the fact that money
laundering was a predicate offense and not the primary offense alleged does Anot change the requirement of
unanimity.  This predicate charge was an essential element of engaging in
organized criminal activity and a prerequisite for conviction of that offense.@  But the Court of Criminal Appeals
has concluded that, in the context of felony murder, the jury is not required
to agree on the predicate felony committed because the felony constitutes the Amanner or means@ that make up the offense of felony
murder.  White v. State, 208 S.W.3d 467, 469 (Tex. Crim. App. 2006). 
Similarly, the predicate felony offense here, money laundering, constitutes the
manner or means of the charged offense, engaging in criminal activity.   








Indeed, other courts have concluded that in an organized
criminal activity prosecution, both the identity of the persons involved in the
combination and the overt acts committed in furtherance of the combination are
preliminary fact issues underlying the verdict.  See Bogany v. State, 54
S.W.3d 461, 463 (Tex. App.CHouston [1st Dist.] 2001, pet. ref=d); Garcia v.
State, 46 S.W.3d 323, 327B28 (Tex. App.CAustin 2001, pet.
ref=d).  Juries are
not required to unanimously agree on the preliminary factual issues underlying
the verdict.  Bogany, 54 S.W.3d at 463; Garcia, 46 S.W.3d at 327B28.  We thus
conclude that there is no error in the jury charge and overrule appellant=s first issue.

III.  SUFFICIENCY OF THE EVIDENCE

Standard
of Review

In reviewing a legal sufficiency challenge, we view the
evidence in the light most favorable to the verdict and determine whether a
rational trier of fact could have found the essential elements of a crime
beyond a reasonable doubt.  Salinas v. State, 163 S.W.3d 734, 737 (Tex.
Crim. App. 2005).  The jury, as the trier of fact, Ais the sole judge
of the credibility of the witnesses and of the strength of the evidence.@  Fuentes v.
State, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).  The jury may choose to
believe or disbelieve any portion of the testimony.  Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986).  The jury may also draw reasonable
inferences from basic facts to ultimate facts.  Clewis v. State, 922
S.W.2d 126, 133 (Tex. Crim. App. 1996).  When faced with conflicting evidence,
we presume the trier of fact resolved conflicts in favor of the prevailing
party.  Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).








In evaluating the factual sufficiency of the evidence, we
view all the evidence in a neutral light and will set aside the verdict only if
we are able to say, with some objective basis in the record, that the
conviction is clearly wrong or manifestly unjust because the great weight and
preponderance of the evidence contradicts the jury=s verdict.  Watson
v. State, 204 S.W.3d 404, 414B17 (Tex. Crim.
App. 2006). We cannot declare that a conflict in the evidence justifies a new
trial simply because we disagree with the jury=s resolution of
that conflict, and we do not intrude upon the fact‑finder=s role as the sole
judge of the weight and credibility of witness testimony.  See id. at
417; Fuentes, 991 S.W.2d at 271.  The fact‑finder may choose to
believe all, some, or none of the testimony presented.  Chambers v. State,
805 S.W.2d 459, 461 (Tex. Crim. App. 1991); Bargas v. State, 252 S.W.3d
876, 888 (Tex. App.CHouston [14th Dist.] 2008, no pet.).  In
our review, we discuss the evidence that, according to appellant, undermines
the jury=s verdict.  Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

Appellant=s Intent

In his second and third issues, appellant challenges the
legal and factual sufficiency of the evidence supporting his conviction. 
Specifically, he asserts the State failed to establish that he and at least two
other members of a combination worked together in a continuing course of
criminal activities.  Appellant contends that the State did not prove the Arequisite intent
to work together in [a] continuing course of criminal activity@ or Athe commission of
money laundering in furtherance of a combination.@  

Here, to establish appellant engaged in organized criminal
activity, the State had to prove that he knowingly engaged in money laundering
and that he intentionally established, maintained, participated in, or
participated in the profits of a combination.  Cf. Hart v. State,
89 S.W.3d 61, 63B64 (Tex. Crim. App. 2002) (explaining that
there are two parts to mental state requirement of engaging in criminal
activity; first is culpable mental state for enumerated offense and second is
intent to establish, maintain, participate in, or participate in the profits of
a combination).  A jury may infer knowledge and intent from the acts, words,
and conduct of the accused.  Id.; Jarnigan v. State, 57 S.W.3d
76, 87 (Tex. App.CHouston [14th Dist.] 2001, no pet.).  We
must examine the entire record to determine if it contains evidence of the
requisite intent.  Hart, 89 S.W.3d at 64. We consider whether there is
sufficient evidence of appellant=s culpable mental
state to commit money laundering first.

As is relevant here, a person commits the offense of money
laundering if he knowingly:

(1)     acquires or maintains an interest in,
conceals, possesses, transfers, or transports the proceeds of criminal
activity; [or]

(2)     conducts, supervises, or facilitates a
transaction involving the proceeds of criminal activity[.]








Tex. Penal Code Ann. ' 34.02(a)(1),
(2).  Criminal activity includes any offense classified as a felony under the
laws of this state or the United States.  Id. ' 34.01(1)(A). 
Appellant admits he committed the felony offense of forgery.  Further, the
record reflects that appellant conducted transactions involving the proceeds of
this criminal act by repeatedly using the funds he deposited in the Brennan
account; ATM cameras recorded him checking the balance on the account and
making withdrawals.  He also stated that he made purchases using the debit card
attached to the Brennan account.  Thus there is both legally and factually
sufficient evidence to support that appellant knowingly engaged in the offense
of money laundering.  We therefore turn to the sufficiency of the evidence to
support appellant=s intent to establish, maintain,
participate in, or participate in the profits of a combination.

A Acombination@ is defined as Athree or more
persons who collaborate in carrying on criminal activities,@ although
participants may not know each other=s identity and the
members of the combination may change periodically.  Id. ' 71.01(a).  A[T]he State must
prove that the appellant intended to >establish,
maintain, or participate in= a group of three or more, in which the
members intend to work together in a continuing course of criminal activities.@  Nguyen v. State, 1 S.W.3d 694,
697 (Tex. Crim. App. 1999).  However, the acts proving the existence of a
combination need not themselves be criminal.  Id. (citing Barber v.
State, 764 S.W.2d 232 (Tex. Crim. App. 1988)). 








Appellant asserts that the testimony establishes three
separate interactions that could support his conviction.  The first involved
appellant, King, and Imoru meeting and purchasing a money order.  Appellant
insists that there is no evidence of any joint action between these three individuals;
he asserts that Imoru was not asked to cash any other checks and did not know
King was involved in other transactions involving checks.  The second
interaction, according to appellant, involves only he and KingCthe transactions
regarding the Brennan account and the deposits of the Safier checks into this
fraudulent account.  Finally, appellant contends that the third interaction,
involving King, Nwalie, Raji, and appellant only establishes the participants
were Aperhaps conspiring
to commit money laundering at the time of their arrest,@ but this offense
had not taken place and conspiracy to commit money laundering was never pleaded
or charged.[9] 


We disagree with appellant=s interpretation
of this evidence and further note that appellant has disregarded the large
volume of documentary evidence indicating a concerted effort to carry on an
ongoing criminal enterprise. The record reflects that numerous individuals
deposited checks illegally drawn on the Safier account.  In fact, two of these
individuals, Catherine Davies and appellant, deposited more than one of these
checks.  Both appellant and Imoru testified that King wrote the Safier checks
they deposited.  They both admitted they were aware that the checks were not
valid when they deposited them.  Further, appellant, King, and Imoru all went
together to withdraw funds via the purchase of a money order from Imoru=s account after
she had deposited one of the Safier checks.  Appellant also acknowledged his
guilt in regard to establishing the Brennan account.[10] 
Although he claimed he did not make the final $8,900 deposit and had returned
the account information to King before this deposit was made, he could not
explain why a deposit receipt for $8,900 to this account, as well as a Social
Security card in Brennan=s name, were discovered on his person at
the time of his arrest.  As discussed above, Boyden also explained that the
type of activity that occurred in the Brennan account was typical of a money
laundering scheme.  Raji, another person involved in the alleged combination,
had a copy of an ATM balance inquiry receipt in his pocket when he was arrested. 
King, Raji, and appellant all participated in the meeting arranged by Nwalie to
discuss cashing other checks.  King, Raji, and appellant were all arrested with
incriminating evidence on their persons, e.g., information regarding
other people=s personal identifiers, bank accounts, or credit card
numbers. 








Viewing this evidence in the light most favorable to the
verdict, we conclude that there is sufficient evidence for a rational jury to
find that appellant intentionally worked with at least two others in an ongoing
criminal enterprise.  See Ford v. State, No. 03-06-00663-CR, 2009 WL
961529, at *5B6 (Tex. App.CAustin Apr. 10,
2009, no pet. h.) (concluding evidence was legally sufficient to support
conviction for engaging in criminal activity when defendant and two others were
arrested with counterfeit blank checks and appellant and each of the other two
had been together at two separate locations when criminal activities had taken
place); Jarnigan, 57 S.W.3d at 87B88.  Additionally,
viewing the evidence in a neutral light, we find no objective basis in the
record for concluding that the jury=s verdict was
clearly wrong or manifestly unjust because it was contradicted by the great
weight and preponderance of the evidence.  See Watson, 204 S.W.3d at 414B17; Jarnigan,
57 S.W.3d at 87B88.  

We conclude that the record contains legally and factually
sufficient evidence from which the jury could infer appellant=s intent to
establish, maintain, or participate in a combination in which the members
intended to work together in a course of criminal activity.  We overrule
appellant=s second and third issues.

Value of Proceeds

In his fourth and final issue, appellant asserts that the
evidence is factually insufficient to prove the value of the proceeds from his
criminal activity was over $100,000.  In this issue, appellant contends that he
only accepted and deposited two checks for $9,500.  








As indicated above, the evidence is legally and factually
sufficient to support his conviction for engaging in organized criminal activity. 
The statutory language of the organized crime statute provides that A>[p]rofits= means property
constituting or derived from any proceeds obtained, directly or indirectly,
from an offense listed in Section 71.02.@  Tex. Penal Code Ann. ' 71.01(c).  In
turn, the money laundering statute permits aggregation of the proceeds from the
criminal activity.  Id. ' 34.02(f) (A[I]f proceeds of
criminal activity are related to one scheme or continuing course of conduct,
whether from the same or several sources, the conduct may be considered as one
offense and the value of the proceeds aggregated in determining the
classification of the offense.@).  Thus, the jury was permitted to
aggregate the proceeds from the criminal activity, i.e., money
laundering, in which appellant engaged.  Appellant acknowledges, and the record
reflects, that the State established the total amount of money unlawfully
removed from Safier=s account was over $118,000.  There is
therefore factually sufficient evidence to support the jury=s conclusion that
the proceeds from the organized criminal activities in which appellant engaged
exceeded $100,000.  We overrule his fourth issue.

Having overruled all of appellant=s issues, we
affirm the trial court=s judgment.    

 

/s/      Leslie B. Yates

Justice

 

Panel consists of Justices Yates, Guzman, and Sullivan.

 

Do
Not Publish C Tex. R. App.
P. 47.2(b).









[1]  Boyden contacted this individual, who reported that a fraudulent
account had been opened using her personal information.





[2]  These figures appear to be check numbers matching
the payee amounts on several of the Safier checks.





[3]  Investigation into Safier=s account revealed that several other checks were
presented for payment but denied by the bank during this same time period.  





[4]  A prepaid phone was used to order the checks and the
apartment to which the checks had been delivered was vacant.  Boyden contacted
the person whose credit card had been used to order the checks; this individual
reported that he had been a victim of identity theft and had not authorized the
charges.





[5]  Imoru, who testified at appellant=s trial, indicated she had been indicted for her
involvement with the check cashing scheme, but agreed to testify truthfully for
the State in exchange for her guilty plea to forgery.  





[6]  Safier=s
bank did not fund this check when it was presented for payment.





[7]  His wife had a job and valid bank account during the time he opened the
Brennan account and deposited the Safier checks.  





[8]  Appellant concedes that he failed to object to the
charge and therefore was required to establish he was egregiously harmed by any
error.  See Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)
(en banc) (op. on reh=g).





[9]  Conspiring to commit an offense under section 71.02
of the Penal Code is an offense of the same degree as the most serious offense
the person conspired to commit.  Tex.
Penal Code Ann. ' 71.02(c).





[10]  Although Nwalie testified that appellant was not aware of the extent of
King=s activities, the jury was entitled
to disbelieve this testimony.  See Chambers, 805 S.W.2d at 461; Sharp,
707 S.W.2d at 614.  Moreover, being aware of the extent of the criminal
activities is not an element of the offense; instead, a participant in
organized criminal activities must commit one of the enumerated offenses with
the intent to participate in a combination or the profits of a combination.  See
Tex. Penal Code Ann. ' 71.02(a).