Affirmed and Majority and Dissenting Opinions filed November 4, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-01131-CR

___________________

 

Frances Unoka Nwosoucha,
Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 185th District Court

Harris County,
Texas



Trial Court Cause No. 1157990

 



 

 

OPINION

A jury
found appellant Frances Unoka Nwosuocha guilty of engaging in organized
criminal activity, namely aggregate theft by a governmental contractor of
property with a value of over one hundred thousand dollars and under two
hundred thousand dollars.  The jury assessed punishment at ten years’
confinement, recommended community supervision, and assessed a $10,000 fine. 
The trial court sentenced appellant accordingly.

In five issues,
appellant challenges the denial of her motion for continuance, the validity of
the indictment on which she was convicted, the sufficiency of the evidence, and
the admission of opinion testimony.  Interspersed among these issues are claims
of ineffective assistance of counsel.  We affirm.

I.  Background

In the early 2000s,
federal and state investigators discovered rampant fraud in Harris County in
billings for Medicare and Medicaid reimbursement for motorized wheelchairs. 
One of the durable medical equipment companies (DMEs) under investigation was
Silver-Hawk, which was owned and controlled by Bibian Uluocha and Achor Uluocha. 
Many of Silver-Hawk’s billings relied on Certificates of Medical Necessity
(CMNs) appellant had signed.

On October 15, 2007, a
grand jury indicted appellant for engaging in organized criminal activity in combination
with Bibian Uluocha, Achor Uluocha, Sharon Thomas, Lewis Gottlieb, and Callie
Herpin.  The indictment was based on appellant’s being a Medicaid provider and
“acquiring and otherwise exercising control over property, to-wit: MONEY, owned
by SHARON THOMPSON and DUANE DURHAIME [sic] . . . of the value of over two
hundred thousand dollars.”

            On
March 14, 2008, a different grand jury indicted appellant for the same
statutory offense.  This indictment was based, however, on appellant’s being a
Medicaid and Medicare provider and “acquiring and otherwise exercising control
over property, to-wit: MONEY, owned by MIRIANA ZOLONDEK and DUANE DURHAIME . .
. of the value of over one hundred thousand dollars and under two hundred
thousand dollars.”[1] 
The assistant grand jury foreman signed the indictment.  On the State’s motion, the court subsequently dismissed the 2007
indictment.

On March 19, 2008, the
State moved to amend the 2008 indictment to add Mark Porter as a complainant,
but the court did not sign an order approving the amendment.  On May 22, 2008,
the State again moved to amend the indictment, requesting to “change one of the
complainant’s name [sic] from Marianna Zolondek to Sharon Thompson.”  The State
further represented, “As amended, the indictment should read ‘Sharon Thompson,
Mark Porter and David Duhaime.’”  On May 28, 2008, the trial court ordered,
“[T]he State of Texas’ [sic] motion for leave to amend the indictment should be
and hereby is GRANTED as specified in the motion.”  The indictment of record
has a line drawn through Zolonder’s name and handwritten additions of
Thompson’s and Porter’s names.[2]

As the case proceeded to
trial, first under the 2007 indictment and then under the 2008 indictment, appellant
filed three motions requesting continuances.  Facing a March 24, 2008 jury
trial date, appellant, on February 14, 2008, filed a “Joint Motion to Set
Matter Preferentially and to Continue the Current Trial Setting.”  Referring to
the “considerable amount of documents and witnesses,” appellant requested a
preferential setting in June, July, or August 2008.  On March 18, 2008,
appellant filed a motion to continue the trial setting for at least ninety days. 
Appellant again referred to the voluminous documents in the case and argued
delay was necessary if she was to receive effective assistance of counsel and a
fair trial.  Although the record does not contain orders reflecting the court’s
ruling on these motions, the court reset the trial date to June 2, 2008.

On June 2, 2008, both
parties appeared and announced ready; but, because of scheduling problems, the
court did not reach the case that week and reset it preferentially for October
20, 2008.[3]
 In early September and October 2008, the trial court issued orders for writs
of habeas corpus ad testificandum commanding that federal prisoners Lewis Gottlieb,
Sharon Thomas, and Callie Herpin be present for the October 20, 2008 trial.

On October 20, 2008,
appellant filed her “Second Motion to Continue Trial Setting.”  She alleged her
counsel’s Galveston office was closed from September 11 until September 30,
2008, because of Hurricane Ike.  As a result, counsel had not been able to
complete trial preparation.  She further alleged, “Counsel can inform the court
that part of the file was damaged, but counsel has been unable to access review
[sic] all of the damaged files because of the breadth and scope of the
destruction.”  Finally, she alleged having received a telephone call from the
State on September 29 regarding new witnesses and documents.  She requested the
trial be reset to the December 2008 or January 2009 docket.

At the hearing on the
motion, appellant’s counsel stated,

This file in particular, I’ve
been able to locate most of the file because it had been set aside upstairs because
it was a current and pending trial file. Some of the file was in the file
drawer, which included my theory of the case, as well as my workup with my
notes in terms of when I was ready for trial last time.

Appellant
argued that, without a continuance, she would be denied effective assistance of
counsel and due process.

            The
State objected to the motion on several grounds.  First, it referred to the
timing of the motion; second, to the effect of further delay on the Medicare
witnesses who were over the age of sixty-five; third, to the efforts already
expended in locating and serving witnesses for the October 20 trial; and finally,
to the burden of recalling the medical witnesses, twelve of whom were out of
county.

The State also described
the new documents as being one month of appellant’s bank records, paper copy of
a disk already provided to the defense, and a disk listing appellant’s activity
involving other companies, which had been described in the offense report
already in defense counsel’s possession.  The new witness was an extraneous
offense witness.

            The
trial court expressed its “great concern” it had not seen the motion until the
morning of trial, observing that, had it known two or three weeks earlier, it
might have been able to provide counsel some assistance.  The court also
referred to all the witnesses being “on board, ready to go,” and October 20 being
the second time the State had brought witnesses from federal prison.

The court concluded,
“[T]his case has got to be tried and the State has had witnesses and they’re
losing witnesses and because of that I am just not in a position where I can
continue this case any longer.”  Before proceeding to voir dire, however, the
court informed defense counsel:  “You are welcome to anything the Court has and
we’ll be happy to make you a copy.  We would have done that earlier, had we known.”

            Presentation
of evidence began October 21.[4] 
The State presented five general groups of witnesses—Medicare and Medicaid
administrators, members of the alleged combination, investigators, wheelchair
recipients or their family members, and physicians.  The State’s case in chief
lasted eight trial days, until October 30, 2008.

Medicaid and Medicare administrators
described the operation of the Medicaid and Medicare programs, the requirements
for DMEs, the documents showing Achor Uluchoa’s and Bibian Uluchoa’s interests
in Silver-Hawk, and the procedure by which claims are processed.  These
witnesses described and explained the CMN, which a physician or physician’s
assistant must sign and a DME must submit in order for the DME to receive
Medicare reimbursement.  One administrator explained the concept of
“progression of disability” in relation to medical necessity and the need to
keep a recipient as active as possible.

Members of the alleged
combination described the scheme in which Bibian and Achor paid recruiters to
locate Medicare beneficiaries or Medicaid recipients and convince them to get “free”
power wheelchairs.[5] 
Bibian and Achor then paid physicians or physician’s assistants in cash to sign
CMNs authorizing the wheelchairs.  Drivers transported the potential recipients
to the doctors and sometimes coached the recipients about how to answer the
doctors’ questions.  Testifying members of the combination included two
physicians, Gottlieb and Herpin, and one runner, Thomas, all of whom had been
convicted in federal court.  A second runner, the granddaughter of a wheelchair
recipient, also testified.

A third group of
witnesses included the persons involved in the State’s investigation of
Silver-Hawk.  Two witnesses, James Cooper and Russell Bliese, testified about
their interviews with wheelchair recipients and their physicians.[6]  They described
the ability of the recipients to walk.  They also described the condition of
the wheelchairs or scooters received, reporting many of them appeared not to
have been used.  Videos of the recipients were introduced during Cooper’s and
Bliese’s testimony.  Cooper and Bliese opined some of the recipients were “not
qualified” or “not eligible” for wheelchairs under Medicare guidelines.  An
investigative auditor for the Texas Attorney General’s Office, a fraud examiner
in the Harris County District Attorney’s Office, and an investigator for the
United States Department of Health and Human Services Office of Inspector
General testified regarding Silver-Hawk’s, Bibian’s, Achor’s, and appellant’s bank
records and other financial documents.

A fourth group of
witnesses consisted of wheelchair and scooter recipients or their family
members.  In general, they testified to a lack of the recipients’ need for, or
use of, a wheelchair or a power wheelchair.  Appellant had signed the CMNs for six
of the eight recipients to whom the testimony pertained.

Finally, thirteen
physicians and one physician’s assistant testified.  Their patients were
recipients of the Silver-Hawk wheelchairs.  Appellant had signed the CMNs for patients
of six of the physicians.  In general, they opined they would not have
recommended a wheelchair for these patients.  Three testified that, to stay as
mobile as possible, a patient should use a progression of mobility devices before
using a power wheelchair.

Over two and one half
days, the defense called seven witnesses, including appellant, a nurse
practitioner who practiced, studied, and taught in the United States after emigrating
from Nigeria.  For the twenty-nine CMNs she admitted signing, appellant testified
she believed power wheelchairs were medically necessary and referred to information
in the recipients’ files as supporting this belief.  Recipients’ conditions
included, but were not limited to, obesity, oxygen dependency, difficulty
walking, shortness of breath, hypertension, anemia, osteoarthritis, rheumatoid arthritis,
and swollen joints or extremities.  She admitted Bibian contacted her, asked
appellant to see “clients” for her, and accompanied her on at least two trips
to the Palestine, Texas, area, where appellant saw seventeen of the twenty-nine
persons for whom she admittedly signed CMNs authorizing a power wheelchair. 
She denied receiving cash or checks for signing CMNs.[7]

In rebuttal, the State
called Aniekan Ekwere.[8] 
Ekwere testified that, in 2002, he started Coastal Medical Supply, a DME, and
became a Medicare and Medicaid contractor.  He bought CMNs from marketers, then
billed Medicare or Medicaid.[9]
 Some of the CMNs contained only the beneficiary name and the equipment
information.  On someone’s recommendation, Ekwere went to appellant’s clinic
and asked her to sign the CMNs.  She signed four CMNs, and Ekwere paid her five
hundred dollars each, in cash.

II.  Denial
of Appellant’s Motion for Continuance

            In
issue one, appellant contends the trial court erred in denying her motion for
continuance.  She further contends that, as a result of the ruling on her
motion, she was denied due process.[10]

A.        Exercise
of Discretion

We review a trial court’s
ruling on a motion for continuance for abuse of discretion.  Gallo v. State,
239 S.W.3d 757, 764 (Tex. Crim. App. 2007).[11] 
To establish an abuse of discretion, a defendant must show she was actually
prejudiced by the denial of her motion.  Id.  Speculation will not
suffice to obtain reversal for a trial court’s failure to grant a continuance. 
See Renteria v. State, 206 S.W.3d 689, 702 (Tex. Crim. App. 2006).

An appellate court will
conclude the trial court’s denial of a motion for continuance was an abuse of
discretion “‘only if the record shows with considerable specificity how the
defendant was harmed by the absence of more preparation time than he actually
had.’”  Gonzales v. State, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010)
(quoting George E. Dix & Robert O
Dawson, 42 Tex. Practice:
Criminal Practice and Procedure § 28.56 (2d ed. 2001)). A defendant can
ordinarily make such a showing only at a hearing on a motion for new trial
because only then will she be able to produce evidence regarding what
additional information, evidence, or witnesses the defense would have had
available if the trial court had granted the motion for delay.  Id. at 842–43.[12]

At issue is appellant’s
motion for continuance filed on October 20, 2008, the date set for trial.  In
her motion, appellant stated her counsel’s office was closed from September 11,
2008 until September 30, 2008 because of Hurricane Ike.  She alleged that,
during that time, counsel had no access to appellant’s file and was not able to
complete trial preparation or ascertain how much of appellant’s file had been
damaged.  She further alleged that, on September 29, 2008, counsel first
learned of additional documents and witnesses the State intended to present. 
On appeal, she argues the trial court erred in not granting her motion because
denial of the motion rendered her counsel ineffective in the following regards:
(1) being unable to hire an expert witness, (2) being surprised by new evidence
the State intended to present, and (3) having to proceed to trial with a
damaged working file.

1.         Inability
to hire an expert.  

By statute, when a
defendant bases a motion for continuance on an absent witness, she must show
(1) she exercised diligence to procure the witness’s attendance; (2) she has
not procured, or consented to, the absence of the witness; (3) she is not
making the motion for delay; and (4) the facts she expects the witness to
prove.  Tex. Code Crim. Proc.
art. 29.06 (Vernon 2006); Harrison v. State, 187 S.W.3d 429, 434 (Tex.
Crim. App. 2005).  A motion for continuance must show on its face the
materiality of the absent testimony.  Harrison, 187 S.W.3d at 434. 
Although there is no comparable statutory provision governing a pretrial motion
for a continuance to secure an expert, lack of such a provision means
determination of such a motion is particularly within the trial court’s
discretion.  Gonzales, 304 S.W.3d at 843–44.

Appellant first raised
her inability to hire an expert in her motion for a new trial.  Thus, the trial
court was not aware of this allegation when it ruled on the motion for
continuance.  An appellate court will not conclude the trial court abused its
discretion on the basis of a theory not presented to it.  See San Jacinto
Methodist Hosp. v. Bennett, 256 S.W.3d 806, 814 n.13 (Tex. App.—Houston
[14th Dist.] 2008, no pet.) (indicating, in context of civil case, that trial
court does not abuse its discretion for not considering grounds not presented
to it).

Although appellant now,
as she did in her motion for new trial, indicates she would have sought the
testimony of Dr. Andrew Nelson Avery of the University of Texas Medical Branch
in Galveston, there is nothing in the record showing the facts she expected him
to prove.[13] 
The record is also devoid of any indication she attempted to secure his
presence for the June 2, 2008 trial, for which she announced ready, or that she
attempted to secure an expert from somewhere other than Galveston after the
hurricane.[14]
 Appellant also had ten calendar days from the start of trial to seek an
expert.

Through skillful
cross-examination, appellant’s counsel elicited favorable opinions from the
treating physicians who testified.  First, several doctors admitted that the
fact a patient could walk did not disqualify the patient from receiving a power
wheelchair.  Second, several doctors testified that patients can lie to health
care providers in order to obtain care, drugs or an item such as a power
wheelchair.  Third, several doctors admitted that patients can fool a health
care provider.  Fourth, the doctors all admitted that medicine is a subjective
art and that reasonable health care providers can differ in their assessments
of a patient.  And fifth, several doctors admitted that there was no requirement
that a patient have an existing relationship with a health care provider before
that health care provider could properly prescribe a power wheelchair.

Because many of the
patients walked into the courtroom and testified in court they did not need or
use the power wheelchair they received, appellant’s defensive theory was that
the patients lied to her to get the wheelchair.  A defense expert could only
repeat the opinions the treating physicians had already given. Appellant has
not established harm in relation to her inability to obtain an expert.  See
Gonzales, 304 S.W.3d at 843.

2.         The “new”
evidence and the lost file.  

In her motion for
continuance, appellant argued the court should continue the trial because
counsel had (1) recently learned about three “new” documents and testimony of an
extraneous offense witness the State intended to offer and (2) lost part of his
file in the hurricane.  Counsel learned of the State’s additional evidence on
September 29, three weeks before trial.

As the State
characterized the documents, they contained information already in appellant’s
possession, i.e., one month of appellant’s bank records, a paper copy of material
previously provided on a computer disk to the defense, and a disk listing
appellant’s activity involving other companies, which had been described in the
offense report already in defense counsel’s possession.  The State did not call
the witness at issue until its rebuttal case, more than thirty days after
counsel received notice.[15] 
Appellant has not established harm in relation to the purportedly new evidence.

At the motion hearing,
counsel stated he had been able to locate most of the file.[16]  The trial court
permitted counsel to copy whatever he needed from the court’s file and
indicated it could have helped in some way if it had known of the problem
earlier.  Appellant has not established harm in relation to the lost file.

Additionally, appellant waited
until the day of trial before filing her motion for continuance.  By that time,
numerous witnesses, including out-of-county physicians, federal prisoners, and
numerous persons over sixty-five, had been subpoenaed and were ready to
testify.  See Gonzales, 304 S.W.3d at 843.  The case had previously been
continued and some of the beneficiaries had already died or were incompetent. 
A reasonable trial judge could have concluded scheduling and other
considerations, as well as fairness to the State, outweighed appellant’s
interest in delay of the trial.  See id.

For the preceding
reasons, we conclude the trial court did not abuse its discretion in denying
appellant’s motion for continuance.

 

 

B.        Due
Process

“‘There are no
mechanical tests for deciding when a denial of a continuance is so arbitrary as
to violate due process.  The answer must be found in the circumstances present
in every case, particularly the reasons presented to the trial judge at the
time the request is denied.’”  Rosales v. State, 841 S.W.2d 368, 374
(Tex. Crim. App. 1992) (quoting Ungar v. Sarafite, 376 U.S. 575, 589, 84
S. Ct. 841, 849–850 (1964)).   In the absence of an abuse of discretion, there generally
can be no violation of due process.  See Hicks v. Wainwright, 633 F.2d
1146, 1148 (5th Cir. 1981) (“When a denial of a continuance forms a basis of a
petition for a writ of habeas corpus, not only must there have been an abuse of
discretion, but it must have been so arbitrary and fundamentally unfair that it
violates constitutional principles of due process.”).  Just as the trial court
did not abuse its discretion, it did not deny appellant due process.

We overrule appellant’s
first issue to the extent it is addressed to the trial court’s exercise of
discretion and appellant’s right to due process.

III.  Amendment
of the Indictment

            In issue two, appellant
argues the State proceeded to trial on an indictment that was not properly
amended.[17] 
She characterizes the 2007 indictment as the “original indictment” and appears
to argue that the State’s “attempts” to add Mark Porter as a complainant, to
add Medicare as one of appellant’s provider categories, and to change the
amount of money misappropriated were ineffective.  Her arguments do not comport
with the procedural facts or the law.

            The
indictment giving rise to the present appeal is not the 2007 indictment, but
the 2008 indictment.  The 2008 indictment, before any handwritten
interlineations, contained allegations that (1) appellant was a Medicaid
provider and a Medicare provider and (2) the value of the misappropriated money
was over one hundred thousand, but less than two hundred thousand, dollars. 
Accordingly, there was no need to amend the 2008 indictment to incorporate
these allegations.

The 2008 indictment
listed Mariana Zolondek and David Duhaime as complainants.  In its first motion
for leave to amend the indictment, the State requested to add Mark Porter’s
name to the list of complainants, stating the amended indictment should read: 
“Marianna Zolondek, Mark Porter and David Duhaime.”  There is nothing in the
record to indicate the trial court granted this amendment.

In its second motion for
leave to amend, the State asked to change one of the complainant’s names from
Marianna Zolondek to Sharon Thompson, stating the amended indictment should read: 
“Sharon Thompson, Mark Porter and David Duhaime.”  Thus, although the State, in
its request, may have assumed Porter was already listed, the State additionally
specified that, as amended, the indictment included Porter as a complainant.  By
signed order, the trial court found “the motion [was] timely and meritorious
and should be granted . . . as specified in the motion.” (emphasis
added.)  Read together, the State’s motion and the trial court’s order authorized
an amendment to include Porter as a complainant.  See Riney v. State, 28
S.W.3d 561, 565 (Tex. Crim. App. 2000) (indicating State’s motion and trial
judge’s granting thereof constitute authorization of eventual amendment of
charging instrument pursuant to Texas Code of Criminal Procedure Article 28.10). 
This amendment was then effected by interlineations on the 2008 indictment, reflecting
the deletion of Zolondek and the addition of Thompson and Porter.  See id.
 (“Physical interlineation of the original indictment is an acceptable but not
the exclusive means of effecting an amendment to the indictment.”).  The State
arraigned appellant on the properly amended 2008 indictment.[18]

Appellant also contends
she was not properly indicted because the assistant grand jury foreperson,
rather than the foreperson, signed the indictment.  Lack of the foreperson’s
signature, however, is not essential to the validity of the indictment.  Id.
at 566; see Owens v. State, 540 S.W.2d 324, 325–26 (Tex. Crim. App.
1976) (stating failure of grand jury foreman to sign indictment does not
vitiate instrument and therefore it is permissible for another grand juror to
sign indictment in foreman’s stead).

For the preceding
reasons we overrule appellant’s second issue to the extent appellant is arguing
the State proceeded to trial on an improperly amended indictment.

IV.  Ineffective Assistance
of Counsel

As part of her first and
second issues, appellant contends she received ineffective assistance of
counsel.[19] 
In addition to the matters raised in her motion for continuance, she complains
that counsel failed to object to the amended indictment and failed to call a
medical expert witness to rebut the State’s physician witnesses.

To prevail on an
ineffective assistance of counsel claim, a defendant must prove (1) trial
counsel’s representation fell below the objective standard of reasonableness (deficient
performance) and (2) there is a reasonable probability that, but for counsel’s
deficiency, the result of the proceeding would have been different (prejudice).
 Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999); see Strickland v. Washington, 466
U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984).

A court need not address
both components of the inquiry if a defendant makes an insufficient showing on
one. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069.  “In particular, a
court need not determine whether counsel’s performance was deficient before examining
the prejudice suffered by the defendant as a result of the alleged
deficiencies.”  Id., 104 S. Ct. at 2069.  Instead, if it is easier to
dispose of an ineffectiveness claim on the ground of lack of sufficient
prejudice, we should do so.  Id., 104 S. Ct. at 2069.

As discussed in Part II,
above, appellant has not shown harm in relation to counsel’s lost file or the
September 29 notification of additional evidence.  Similarly, she has not met
her burden of showing prejudice in relation to these matters.

In Part III, above, we
concluded there was no impropriety in amendment of the indictment. 
Accordingly, counsel was not constitutionally ineffective in failing to object
to the amended indictment.  See Ladd v. State, 3 S.W.3d 547, 565 (Tex. Crim.
App. 1999).

Finally, as discussed in
Part II, above, appellant has not shown how she would have benefited from Dr.
Avery’s testimony had counsel been given additional time to locate him.        “Counsel’s
failure to call witnesses at the guilt-innocence and punishment stages is
irrelevant absent a showing that such witnesses were available and appellant
would benefit from their testimony.”  King v. State, 649 S.W.2d 42, 44
(Tex. Crim. App. 1983).

For the preceding
reasons, we overrule appellant’s first and second issues to the extent
appellant is arguing ineffective assistance of counsel.

V.  Sufficiency
of the Evidence

A.        Standard
of Review

In issues three and
four, appellant challenges the sufficiency of the evidence to support her
conviction.[20] 
When reviewing the sufficiency of the evidence, we examine all the evidence in
the light most favorable to the verdict to determine whether any rational trier
of fact could have found the essential elements of the offense beyond a
reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct.
2781, 2789 (1979); Williams v. State, 301 S.W.3d 675, 683–84 (Tex. Crim.
App. 2009).  Five justices of the Texas Court of Criminal Appeals recently
concluded this standard is the only standard a reviewing court should apply to
determine whether the evidence is sufficient to support each element of a
criminal offense the State is required to prove beyond a reasonable doubt.  See
Brooks v. State, No. PD-0210-09, 2010 WL 38946l3, at *1 (Tex. Crim. App.
Oct. 6, 2010) (plurality op.); see also id. at *16–17 (Cochran, J., concurring).

Although we consider all
the evidence presented at trial, we may not re-weigh the evidence or substitute
our judgment for that of the jury.  See Williams v. State, 235 S.W.3d
742, 750 (Tex. Crim. App. 2007).  The jury is the exclusive judge of the
credibility of witnesses and of the weight to be given their testimony;
likewise, it is the exclusive province of the jury to reconcile conflicts in
the evidence.  Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App.
2000).  We consider both direct and circumstantial evidence, and all reasonable
inferences that may be drawn from the evidence in making our determination.  Clayton
v. State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

B.        Statutory Provisions

The jury found appellant
guilty of “engaging in organized criminal activity, namely, aggregate theft of
property by a governmental contractor of the value of over one hundred thousand
dollars and under two hundred thousand dollars.”  The jury was instructed, “A
person commits an offense of engaging in organized criminal activity if, with
the intent to establish, maintain, or participate in a combination or in the
profits of a combination, she commits aggregate theft.”  See Tex. Penal Code Ann. § 71.02(a)(1)
(Vernon Supp. 2009).[21]

A finding of guilt for
engaging in organized criminal activity requires (1) an intent to participate
in a criminal combination and (2) performance of some act, although not
necessarily criminal in itself, in furtherance of the agreement.  Jarnigan
v. State, 57 S.W.3d 76, 87 (Tex. App.—Houston [14th Dist.] 2001, pet.
ref’d).[22] 
“Because direct evidence is rarely available to prove the existence of an
agreement, circumstantial evidence is sufficient and is almost always needed.” 
Id.  The jury may therefore “infer an agreement among a group working on
a common project when each person’s action is consistent with realizing the
common goal.”  Id.

“A person acts
intentionally, or with intent, with respect to the nature of [her] conduct or
to a result of [her] conduct when it is [her] conscious objective or desire to
engage in the conduct or cause the result.”  Tex.
Penal Code Ann. § 6.03(a) (Vernon 2003).  A “combination” is “three or
more persons who collaborate in carrying on criminal activities, although: (1)
participants may not know each other’s identity; (2) membership in the
combination may change from time to time; and (3) participants may stand in a
wholesaler–retailer or other arm’s length relationship in illicit distribution
operations.”   Id. § 71.01(a).  “‘Profits’ means ‘property constituting
or derived from any proceeds obtained, directly or indirectly, from an offense
listed in section 71.02.’” Id. § 71.01(c).

Theft is the unlawful
appropriation of property done with intent to deprive the owner of the
property.  Id. § 31.03(a) (Vernon Supp. 2009).  Appropriation is
unlawful if it is done without the owner’s effective consent.  Id. §
31.03(b)(1).  Consent is not effective if it is induced by deception or
coercion.  Id. § 31.01(3)(A).  Deception means, inter alia,
“creating or confirming by words or conduct a false impression of law or fact
that is likely to affect the judgment of another in the transaction, and that
the actor does not believe to be true.”  Id. § 31.01(1)(A).

“‘Appropriate’ means . .
. to acquire or otherwise exercise control over property other than real
property.”  Id. § 31.01(4)(B).   “When amounts are obtained in
violation . . . pursuant to one scheme or continuing course
of conduct, whether from the same or several sources, the conduct may be
considered as one offense and the amounts aggregated in determining the grade
of the offense.”  Id. § 31.09 (Vernon 2003).

C.        Analysis

In issue three,
appellant contends the evidence was insufficient “as a matter of law” because the
State failed to prove a two-hundred-thousand-dollar Medicaid loss.  As part of
this issue appellant also argues the evidence of Silver-Hawk’s corporate
billing was insufficient to establish appellant’s participation in a combination
with Bibian and Achor and there was no showing appellant was involved with Gottlieb
or Herpin.  As part of issue four, appellant again refers to the evidence
regarding the amount of the loss and the alleged members of the combination. 
She also contends there was insufficient evidence of intent.

As discussed in Part III,
above, the 2008 indictment on which appellant was properly tried contained allegations
that (1) appellant was a Medicaid and a Medicare provider and (2) the value of
the misappropriated money was over one hundred thousand, but less than two
hundred thousand, dollars.  Thus the State was required to prove a loss of more
than one hundred (not two hundred) thousand dollars and could look to Medicare
and Medicaid losses to prove that amount.  The State also needed to prove a
combination of only three persons, including appellant.  See Tex. Penal Code Ann. § 71.01(a); Jahanian
v. State, 145 S.W.3d 346, 350 (Tex. App.—Houston [14th Dist.] 2004, no
pet.).  With these clarifications, we turn first to the evidence supporting
findings of (1) a combination, (2) the amount of loss attributable to the
combination, and (3) intent.  We then briefly discuss the evidence supporting
the defense.

1.         The Combination of
Appellant, Bibian, and Achor

Appellant provides no
legal authority to support her argument regarding use of the evidence of
Silver-Hawk’s billing in relation to Bibian’s and Achor’s involvement in the
combination.  See Tex. R. App. P.
38.1(i); Trenholm v. Ratcliff, 646 S.W.2d 927, 934 (Tex. 1983) (“Points
of error must be supported by argument and authorities, and if not so
supported, the points are waived.”).  Moreover, there was substantial evidence
Bibian and Achor, who were husband and wife, owned, directed, and operated
Silver-Hawk.  That evidence included the following:  a Medicaid Provider
Agreement naming Bibian, doing business as Silver-Hawk, as the provider;
Bibian’s signature as administrator on Silver-Hawk’s Medicaid Provider
Information Form; Bibian’s listing as the person having direct or indirect
ownership interests or controlling interests in Silver-Hawk; Achor’s and
Bibian’s listings as directors and incorporators on Silver-Hawk’s Articles of
Incorporation; Achor’s designation as president on Silver-Hawk’s Articles of
Incorporation; Achor’s and Bibian’s listings as officers on Silver-Hawk’s Texas
Franchise Tax Public Information Report; Achor’s signature on Silver-Hawk’s
lease for its office space; Achor’s statement to Porter, during the on-site
inspection of Silver-Hawk, that Achor was Silver-Hawk’s manager; and Achor’s and
Bibian’s listing as signators on Silver-Hawk’s bank accounts.

There was also
substantial evidence appellant participated in combination with Achor and
Bibian in their Silver-Hawk operation.  A Silver-Hawk runner testified she saw
appellant answering telephones at Silver-Hawk and Bibian introduced them.  Appellant
admitted she traveled with Bibian to Palestine, Texas, three times.  On three
checks Bibian wrote to herself on Silver-Hawk’s bank account, she noted “Frances”
in the memo line.[23] 
Appellant deposited large amounts of cash to her bank account shortly after
Bibian wrote these checks.[24]

We conclude the evidence
was sufficient to support a finding of a combination of appellant, Bibian, and
Achor.

2.         Amount
of Medicare’s and Medicaid’s Loss Based Solely on Falsified CMNs Appellant Signed
in Combination with Bibian and Achor[25]

Based on twenty-three CMNs signed by appellant and
submitted by Silver-Hawk, Medicare and Medicaid paid over one hundred thousand
dollars in claims.[26] 
They did so without their effective consent because payment was induced by
appellant’s deception.  We turn now to the following evidence supporting the
existence of deception resulting in a loss of more than one hundred thousand
dollars:  testimony and documents delineating Medicare’s and Medicaid’s
requirements for providing power wheelchairs, the factual representations contained
in the CMNs appellant signed, medical testimony and medical records regarding
the beneficiaries, direct observational evidence of individual beneficiaries’
physical conditions, evidence of the circumstances under which appellant signed
seventeen of the CMNs, and the undisputed amounts Medicare and Medicaid paid
for each of the twenty-three recipients.

Sharon Thompson, senior
policy advisor for the Texas Health and Human Services Commission in the
Medicaid CHIP division, testified that, when a beneficiary is covered by both
Medicare and Medicaid, the Medicare guidelines control the determination of
medical necessity for durable medical equipment.  Mark Porter, an employee of
Palmetto GBA, a federally-contracted health insurance company administering the
Medicare program, testified a Medicare Supplier Manual (Manual) is issued to
all Medicare providers.  To qualify for a motorized wheelchair under Manual
guidelines, a potential recipient must meet all the following criteria:  the
patient’s condition must be such that, without the use of a wheelchair, the
patient would otherwise be bed- or chair-confined; a wheelchair must be
medically necessary; the patient must be unable to operate a manual wheelchair;
and the patient must be capable of safely operating the controls for the power
wheelchair.  According to Porter, the Manual further provides that “a patient who
requires a power wheelchair usually is totally nonambulatory and has severe
weakness of the upper extremities due to a neurological or muscular disease or
condition.”

Porter explained that
Section B of the CMN is a tool assisting the Medicare processing system to
determine whether or not the patient has a medical necessity for motorized
wheelchair.  The section contains the following seven questions which the
treating physician or someone in that physician’s office is to answer:

1.      Does
the patient require and use a wheelchair to move around in their [sic]
residence?

2.      Does
the patient have quadriplegia, a fixed hip angle, a trunk cast or brace,
excessive extensor tone of the trunk muscles or a need to rest in a recumbent
position two or more times during the day?

3.      Does
the patient have a cast, brace or musculoskeletal condition, which prevents 90
degree flexion of the knee, or does the patient have significant edema of the
lower extremities that requires an elevating leg rest; or is a reclining back
ordered?

4.      Does
the patient have a need for arm height different than that available using
non-adjustable arms?

5.      How
many hours per day does the patient usually spend in the wheelchair? (1–24)
(Round up to the nearest hour)

6.      Does
the patient have severe weakness of the upper extremities due to a neurologic,
muscular, or cardiopulmonary disease/condition?

7.     
Is the patient unable to operate any type of manual wheelchair?

 

The evidence regarding
the individual recipients included testimony from the recipients’ primary
physicians, videos showing recipients in their homes, testimony from the
recipient or a family member, and testimony from the investigators describing
their interviews with the recipients.[27] 
Additionally, appellant signed seventeen CMNs in two days for identical
equipment for persons appellant saw in groups near Palestine, Texas.  We turn now
to the evidence for each of the twenty-three recipients.[28]

a.         Chloe G.—Medicare’s
monetary loss:  $4,674.26

On Chloe G.’s CMN, signed
March 19, 2003, appellant answered questions one, two, six, and seven
affirmatively.  She stated Chloe usually spent nine hours a day in a
wheelchair.

Chloe’s physician, Dr.
Alan Smith, testified he was familiar with the Medicare and Medicaid guidelines
required for powered wheelchairs, including the requirement a patient had to be
nonambulatory.  Smith testified that, “as a generalization, we’re talking about
a person who cannot walk, even with a walker, they don’t have the strength, for
example, in the legs, a person that does not have upper body strength to use a
manual wheelchair . . . .”  Smith had been Chloe’s physician from 1997 until
her death in 2007.  Smith believed Chloe walked with a cane and “at the end, may
have had a walker.”  Chloe “had some fairly severe osteoarthritis. She
complained of arthritic pain.  But as far as needing something to assist beyond
maybe a cane or walker, no, she did not.  That was only toward the end . . . in
2006.”  In Smith’s medical opinion, Chloe did not need a wheelchair.

Investigator Richard
Bliese testified he interviewed Chloe in her home on September 11, 2006.  Chloe
was able to walk unassisted.  Bliese opined Chloe “was not qualified” for a
wheelchair.  Chloe was deceased at the time of trial.

b.         Donald H.—Medicare’s
monetary loss:  $4,800.23[29]

On Donald H.’s CMN,
signed December 4, 2002, appellant answered questions one, two, three, six, and
seven affirmatively. In response to question five, she stated Donald usually
spent nine hours a day in a wheelchair.

Donald’s treating physician,
Dr. James Baker, testified forty percent or more of his patients are on
Medicare and he evaluated four or five patients a month for mobility devices. 
He described the factors he looked for when evaluating a patient for a power
wheelchair, including whether a person’s hands or arms are too weak to power a
manual wheelchair.

Donald was Baker’s
patient since 2000.  Donald had severe emphysema and a mild heart ailment. 
After a brief hospitalization in autumn 2002, Donald walked into Baker’s
office, was not experiencing trouble moving, and was not using a cane or walker. 
During his hospital stay, Donald had walked outside to smoke cigarettes.  Baker
disagreed with the answers to questions one, two, three, five, six, and seven
on Donald’s CMN.  Although Donald’s condition had deteriorated greatly since
then, according to Baker, Donald would not have qualified for a power
wheelchair or scooter in 2002.

Bliese interviewed Donald
at his home in August 2006 and also talked with Dr. Baker.  Bliese observed
Donald did not need a wheelchair to move about the residence, but was walking. 
After talking with Dr. Baker and Donald and making his observations, Bliese
concluded Donald did not require a power wheelchair under Medicare guidelines in
2002 to 2003.  The jury viewed a video showing Donald sitting in a chair, using
a ventilator.

            c.         Myrtle
H.—Medicare’s monetary loss:  $4,955.81

On Myrtle H.’s CMN,
signed December 4, 2002, appellant answered questions one, two, four, six, and
seven affirmatively.  In response to question five, she stated Myrtle usually
spent nine hours a day in a wheelchair.

Myrtle’s physician, Dr.
Jason Laningham, testified fifty percent of his patients were older and
frequently requested wheelchairs.  He was familiar with the CMN; and, in nine
years, he had prescribed only two to three power wheelchairs.

According to Laningham,
Myrtle used a walker.  Laningham indicated answers one, five, and seven on
Myrtle’s CMN were incorrect.  He did not disagree with the answers to the
remaining questions, but considered some of them subjective.  Laningham
testified that, if Myrtle wanted a manual wheelchair, she could use one, but he
would not have ordered a power wheelchair for her.  In his medical opinion
there was no medical necessity for Myrtle to have a power wheelchair.

Bliese testified that,
after observing and talking with Myrtle and talking with her physician and
daughter, he determined questions one, two, five, and seven on Myrtle’s CMN
were answered falsely.  He further opined Myrtle did not qualify for a wheelchair
under Medicare guidelines.  The jury viewed a video, taken April 22, 2008,
showing Myrtle walking with the assistance of a cane as she came out of her
residence, down the stairs, and over to the shed where she kept the wheelchair.

            d.         James
H.—Medicare’s monetary loss:  $4,800.23

On James H.’s CMN, signed
September 30, 2002, appellant answered questions one, six, and seven
affirmatively.  In response to question five, she stated James usually spent
nine hours a day in a wheelchair.

James’s physician, Dr.
Martin Caperton, testified that twenty-five to thirty percent of his patients
were older or geriatric.  He was familiar with the CMN and in twenty-nine years
of practice had prescribed power wheelchairs less than five times.

James had been Caperton’s
patient since 2000.  Caperton knew James did not use a wheelchair to move
around his residence.  The answer to question five was incorrect.  Caperton further
testified the answers to questions six and seven were also incorrect.  Finally,
Caperton testified he was “not aware of any medical need for an assisted mobility
device” for James.

James testified that two
women approached him at his house in Willis in 2002 about getting a power
wheelchair.  James, who was seventy-five years old, was not using a cane or
walker and did not own a wheelchair. The women insisted James should get a
wheelchair because it was free and he might need one someday.  The women
subsequently brought James and two other men to Houston.[30]  Reviewing his
CMN at trial, James testified he never had a wheelchair, did not spend nine
hours a day in one, did not have severe weakness of his upper extremities, and
could have used a manual wheel chair if he had needed to.[31]

Bliese interviewed James
in September 2006 and also talked with Caperton.  Bliese observed James did not
need a wheelchair to move around in his house.

e.         Catalina
T.—Medicare’s and Medicaid’s combined monetary loss:  $5,934.54

On Catalina T.’s CMN, signed October 1, 2002, appellant
answered questions one, three, six, and seven affirmatively.[32]  In response to
question five, she stated Catalina usually spent ten hours a day in a wheelchair.

            Catalina’s
physician, Dr. Carlos Palacios, testified that two-thirds of his patients were
sixty-five years old or older.  He saw CMNs “very often.”  When determining
whether to prescribe a power wheelchair, a physician needed to consider the benefits
and detriments to the patients, as well as safety.  He had prescribed only a
very small number of motorized wheelchairs in his years of practice. 

Catalina was Palacios’s
patient from 1999 or 2000 until 2005, when she began seeing one of Palacios’s
associates.  Catalina saw Palacios three or four times a year.  She came to his
office “[w]alking or walking with a walker.”  Catalina was morbidly obese and
had frequent inflammation and fluid accumulation in her legs.  Given the poor
circulation in her legs, it was best for her to have some physical activity. 
He disagreed with the answer to questions six and seven.  Finally, he opined, “I
think a motorized wheelchair was not necessary for her, and I think maybe even
a little bit detrimental to her health to encourage [her] to use a wheelchair
versus physical activity.”

Catalina’s
daughter-in-law, Oralia T., testified that Catalina used a walker in 2002 and Palacios
did not want her to have a power wheelchair because he wanted her to walk.  Oralia,
however, did want her mother-in-law to have the wheelchair, and E.J., a person associated
with Silver-Hawk, took Catalina and Oralia to appellant’s office.  Appellant
spent fifteen minutes with Catalina and checked her heart, but did not ask her
any questions.  According to Oralia, the answers to questions one, five, and
seven on Catalina’s CMN were false.

Investigator James Cooper
interviewed Catalina and her granddaughter at Catalina’s apartment.  Cooper
observed Catalina was able to walk around the apartment.  Cooper also spoke
with Palacios.  Based on his training, experience and qualifications, his
understanding of the Medicare and Medicaid guidelines, and his conversations
with Catalina, her granddaughter, and Palacios, Cooper formed an opinion
Catalina did not qualify for a motorized wheelchair or scooter.

 

f.          Robert J.—Medicare’s
monetary loss:  $4,674.26

On Robert J.’s CMN,
signed March 19, 2003, appellant answered questions one, two, six, and seven
affirmatively.  In response to question five, she stated Robert usually spent
nine hours a day in a wheelchair.  Robert testified that was false.

Robert’s physician, Dr.
David Thompson, testified that fifty to sixty percent of his patients were
older.  He was familiar with the CMN and ordered power wheelchairs four to six
times a year.  He opined that many persons who wanted power wheelchairs did not
need them and described how he discourages patients from getting them.

Robert had been
Thompson’s patient since March 2003.  Robert had elevated blood pressure and
sinus problems, but no difficulty walking.  Reviewing Robert’s CMN, Thompson
testified the answers to questions one, two, five and six were incorrect. 
Regarding the answer to question seven, Thompson stated he had never tested
Robert for a wheelchair.

Robert testified that, in
2002 or 2003, a friend of his called and told Robert he could get a free wheelchair
if he wanted to.  Robert, his wife, and several other people went to the Bethel
AME Church in Montalba, where a woman spent two or three minutes with him and checked
his blood pressure and heart.[33] 
The woman did not ask him any questions.  According to Robert, everyone at the
church was there to get a wheelchair, but all were walking.  Robert guessed
there were ten people there.  A day or so later a different woman asked Robert
to come to her house, where he signed several papers.  Robert subsequently received
a wheelchair.

g.         Valley J.—Medicare’s
monetary loss:  $4,631.42

On Valley J.’s CMN,
signed March 19, 2003, appellant answered questions one, two, six, and seven
affirmatively.  In response to question five, she stated Valley usually spent
eight hours a day in a wheelchair.

Valley, who was Robert J.’s
wife, testified that, in 2002 or 2003, Jessie Summers came through the
neighborhood saying they had free wheelchairs.  Valley told Summers she did not
need one because she was not disabled.  Summers returned, however, and convinced
Valley the second time.  Valley and her husband then went to the Bethel AME
Church, where they met Summers and a man and woman from Houston.  Valley
estimated there were six or seven other people at the church, including C.W.B. 
Everyone sat down in the kitchen and a woman checked their blood pressure.  No
one asked them any questions.  Valley subsequently received a wheelchair. 
Valley testified it would be false if someone said she required a wheelchair to
move around the house or that she spent eight hours a day in a wheelchair.

Bliese interviewed Robert
and Valley J. in their home in September 2006.  Both “were walking fine.” 
Additionally, on both Robert’s and Valley’s charts appellant checked “Unassisted”
for ambulation, a functional status Bliese opined was “inconsistent” with
issuance of a power wheelchair under the guidelines.

h.         John W.—Medicare’s monetary
loss:  $4,822.66

On John W.’s CMN, signed
April 23, 2003, appellant answered questions one, two, six, and seven
affirmatively.  In response to question five, she stated John spent eight hours
a day in a wheelchair.

John testified he had
undergone back and neck surgery in 1994 and used a cane or crutches or walked
on his own in 2002 and 2003.  A counselor from a group he was attending
introduced him to someone from Silver-Hawk.  The counselor drove him to a
doctor’s office in Houston, where he was seen by a “black [woman], with an
accent.”  The examination lasted about two minutes, with the woman testing the
amount of pressure resistance in his legs and asking him about his pain. 
Although someone later told John he had been approved, John never received a
wheelchair.  John testified that, in April 2003, the answers to questions one,
two, five, six, and seven on his CMN would have been false.

Bliese testified he
interviewed John at John’s residence in April 2008.  Bliese observed John was
“ambulatory.”

i.          Rubie L.—Medicare’s
monetary loss:  $4,720.23

On Rubie L.’s CMN, signed
October 18, 2002, appellant answered questions one, six, and seven
affirmatively.  In response to question five, she stated Rubie spent eight
hours a day in a wheelchair.

Rubie had died by the
time of trial, but his wife, Ruby, testified.  In 2002, two women approached
them at their house.  They convinced Rubie, but not Ruby, to get a wheelchair,
and they next day they drove both Rubie and Ruby to Houston.  After they
arrived at the office, Rubie was in a separate room for fifteen to twenty
minutes.  According to Ruby, Rubie walked in and out of the office because he
did not have any problems walking.  Rubie subsequently received a scooter, which
he never used.  Ruby testified Rubie never spent any time in a wheelchair of
any kind until he became ill in 2007.

Bliese interviewed Ruby
in her home and reviewed appellant’s file for Rubie.  Bliese concluded Rubie
was not qualified for a wheelchair.

j.          Jessie B.—Medicare’s and Medicaid’s combined monetary loss: 
$5,842.82

On Jessie B.’s CMN, signed March 19, 2003, appellant
answered questions one, two, six, and seven affirmatively.  In response to
question five, she stated Jessie spent nine hours a day in a wheelchair.

The jury saw a video of
Jessie.  She walked slowly, but unassisted, down the stairs from her mobile
home, along the front of her home, and to the side where she kept the
wheelchair.  In the medical chart prepared by appellant, appellant checked “Unassisted”
for ambulation.

Bliese interviewed Jessie
in her home in April 2007.  He observed she was ambulatory and did not need any
assistance walking.  After
talking with Jessie, observing her during the interview, and reviewing the video,
Bliese formed an opinion Jessie was not qualified to receive a wheelchair.

k.         Clarence B.—Medicare’s
monetary loss:  $4,674.26

On Clarence B.’s CMN,
signed March 31, 2003, appellant answered questions one, two, four, six, and
seven affirmatively.  In response to question five, she stated Clarence spent
nine hours a day in a wheelchair.

The jury saw a video of
Clarence.  He walked unassisted in the yard outside his home.  In the medical
chart prepared by appellant, appellant checked “Cane” for ambulation.

Bliese interviewed Clarence
in his home in April 2008.  He was ambulatory.  It did not appear that he
needed a wheelchair or scooter.  Bliese formed the opinion Clarence did not
require or need a wheelchair under the Medicare guidelines.

            l.          Lillie
G.—Medicare’s monetary loss:  $4,674.26

On Lillie G.’s CMN,
signed March 31, 2003, appellant answered questions one, two, six, and seven
affirmatively.  In response to question five, she stated Lillie spent nine
hours a day in a wheelchair.

The jury saw a video of
Lillie.  Using a wheeled walker, she walked slowly from the living room,
through the kitchen, to a room where the wheelchair was stored, wrapped in
plastic, next to a roll of carpet.

Bliese interviewed Lillie
in September 2006.  He described Lillie as “elderly, but she was able to still walk
around and was not using . . . any type of wheelchair.”  Based on his training
and experience, his interview, and his observations, Bliese formed an opinion
Lillie was not qualified to receive a wheelchair for which Medicare would pay.

            m.        Esther
P.—Medicare’s monetary loss:  $4,674.26

On Esther P.’s CMN, signed March
31, 2003, appellant answered questions one, two, four, six, and seven
affirmatively.  In response to question five, she stated Esther spent nine
hours a day in a wheelchair.

The jury saw a video of
Esther.  After walking a short distance inside her home, she used a cane to
walk to and around the outside deck.

Bliese interviewed Esther
at her residence in April 2008.  She was ambulatory and it did not appear to
Bliese that she needed a wheelchair.  After talking with Esther and making his
observations during the interview, Bliese formed the opinion Esther did not qualify
for a wheelchair.

n.         Sadie
G.—Medicare’s and Medicaid’s combined monetary loss:  $5,842.82

On Sadie G.’s CMN, signed
March 31, 2003, appellant answered questions one, two, six, and seven
affirmatively.  In response to question five, she stated Sadie spent eight
hours a day in a wheelchair.

A video of Sadie was
admitted into evidence.[34] 
She walked unassisted from the inside of her house to the porch and told the
investigator she never used the wheelchair.  The video also showed paperwork
indicating Jessie Summers had delivered the chair.   In the medical chart,
prepared by appellant, appellant checked “Cane” and “Walker” for ambulation.

o.         Other
recipients for whom appellant signed CMNs on either March 19 or March 31, 2003.

On March 19, 2003, appellant signed CMNs for nine
recipients she had seen at the church in Montalba.  On March 31, 2003, she
signed CMNs for eight recipients she had seen in Palestine.

            On
each of these seventeen CMNs, appellant affirmed the patient required and used
a wheelchair to move around the residence.  Appellant also provided a specific
number of hours the patient spent per day in a wheelchair.  Dr. Thompson,
Robert J.’s regular physician, opined that signing this many CMNs was
“excessively high” and “consistent with the patients being fooled.”

Robert and Valley J.
described the event resulting in the March 19 CMNs.  Robert’s individual
examination lasted two to three minutes and no one asked either of them any questions. 
Robert observed everyone was walking.  Valley J. said C.W.B. was present at
this group session.

The seventeen CMNs contained
identical content in the sections for the supplier’s information and the
narrative description of the equipment and cost.  Identical flaws appeared on
the forms, indicating multiple preprinted copies which were then given to
appellant for completion and signature.  Appellant admitted when Bibian went to
Palestine with her, section C of the CMNs was completed in advance.[35]  Appellant
thought “the codes were already there and I interpret it as wheelchair that the
patient would need.”

Thus, regarding the seventeen
Montalba and Palestine recipients, there was direct evidence appellant
falsified the answers on eight CMNs[36]
and circumstantial evidence she falsified answers on the other nine.  These
other nine CMNs were those for Ola A. (Medicare monetary loss, $4,674.26),
Norris B. (Medicare monetary loss, $4,674.26), C.W.B. (Medicare and Medicaid
combined monetary loss, $5,842.82), Jettie J. (Medicare and Medicaid combined
monetary loss, $5,842.82), Robert R. (Medicare monetary loss, $4,674.26), Q.B.G.
(Medicare monetary loss, $4,594.26), Ollie D. (Medicare monetary loss, $4,606.30),
M.M. (Medicare monetary loss, $4,674.26), and Lorine L (Medicare monetary loss,
$4,674.26).

In sum, Medicare and
Medicaid reimbursed Bibian and Achor’s DME based on twenty-three CMNs, which
appellant admitted signing and for which there was evidence they contained
falsified information.  The total Medicare and Medicaid loss for these CMNs
alone was $113,979.56.

We conclude the evidence
was sufficient to support a finding of aggregate theft of over one hundred
thousand dollars for the twenty-three CMNs detailed above.

3.         Intent

As part of issue four,
appellant appears to argue there was insufficient evidence of intent.[37]  There are two
parts to the mental state requirement for engaging in organized criminal
activity.  Hart v. State, 89 S.W.3d 61, 63 (Tex. Crim. App.
2002).  One mental state requirement is included in the
commission of one of the enumerated offenses.  Id. (citing Tex. Penal Code § 71.02(a)).  For
example, if, as here, the enumerated offense is theft, the State must prove
that the appellant intended to deprive the owner of property as part of proving
the underlying enumerated offense.  See id. (citing Tex. Penal Code § 31.03(a)).  The other
is the defendant’s intent to establish, maintain, participate in, or
participate in the profits of, a combination.  Id.  The jury may infer
the existence of either mental state from any facts tending to prove its existence,
including the acts, words, and conduct of the accused.  Dobbins v. State,
228 S.W.3d 761, 765 (Tex. App.—Houston [14th Dist.] 2007, pet. dism’d).

As discussed above, there
was direct evidence appellant falsified answers on fourteen CMNs and
circumstantial evidence she falsified answers on nine more.  In some cases, the
answer to CMN question one regarding the necessity of a wheelchair directly
contradicted information about ambulation contained in appellant’s
corresponding patient file.  From appellant’s testimony that she interpreted
the pre-printed section C on the CMNs as being the wheelchair the patient would
need, a jury could infer she knew she was creating a scenario in which Medicare
and Medicaid would reimburse Silver-Hawk for a wheelchair and was thus
depriving Medicare and Medicaid of their property.

Appellant testified she
knew Bibian would not give the pre-printed CMNs to a company other than
Bibian’s own.  As discussed above, there was circumstantial evidence appellant
received cash payments from Bibian.  This evidence consisted of three checks
Bibian wrote to herself on Silver-Hawk’s bank account on which she noted
“Frances” in the memo line and cash deposits to appellant’s bank account
shortly thereafter.  From this evidence, a jury could infer appellant intended
to participate in the profits of the combination.

We conclude the evidence
was sufficient to support a finding of intent.

4.         Evidence
Favoring the Defense

The primary evidence
favoring the defense was appellant’s own testimony.  She denied receiving any
money from Bibian, Achor, or any runner and testified she had never worked for
Silver-Hawk or been to its location.  She explained cash deposits to her bank
account as resulting from her jewelry business.

She did home visitations for
the Visiting Nurses Association and for MD Healthcare Services.  She estimated
her clinical assessments lasted at least twenty to thirty minutes.  She
answered the questions on the CMNs based on her assessment of the potential recipients
and did not sign a CMN for everyone she saw.  She testified she wanted to
improve patients’ health by conserving their energy.

Appellant also relied on
cross-examination of the State’s witnesses.  Specifically, she elicited favorable
testimony from the treating physicians as outlined in Section II above to
support her theory that the patients lied to her and/or it was her medical
opinion that the patients needed wheelchairs.

It was, however, for the
jury to determine appellant’s credibility and the strength of her
evidence.  See Fuentes v. State, 991 S.W.2d 267, 271
(Tex. Crim. App. 1999).  We conclude the evidence was sufficient to support
appellant’s conviction.  Accordingly, we overrule appellant’s issues three and
four.

VI.  Opinion
Evidence

            In issue five, appellant
argues “[t]he trial court erred in allowing non-expert witnesses to proffer
their opinions of medical necessity.”  Specifically, she refers to the
testimony of James Cooper and Russell Bliese, who were involved in the
Silver-Hawk investigation.  Cooper interviewed one recipient for whom appellant
allegedly signed the CMN; Bliese interviewed fifteen.[38]  Both also interviewed
recipients for whom other physicians had written the CMNs.  The testimony about
which appellant complains consisted of Cooper’s and Bliese’s opinions the
recipients “did not qualify” or were “not qualified” for wheelchairs or power
wheelchairs under the Medicare and Medicaid guidelines.[39]  Appellant objected to
this testimony on the ground Cooper and Bliese were not qualified to offer the
opinions because they were not medical doctors.

Texas Rule of Evidence
702 provides:  “If scientific, technical, or other specialized knowledge will
assist the trier of fact to understand the evidence or to determine a fact in
issue, a witness qualified as an expert by knowledge, skill, experience,
training, or education may testify thereto in the form of an opinion or
otherwise.”  Tex. R. Evid. 702.  The
expert’s knowledge and experience must be “beyond that of an average juror.”  Duckett
v. State, 797 S.W.2d 906, 914 (Tex. Crim. App. 1990), disapproved on
other grounds by Cohn v. State, 849 S.W.2d 817, 819 (Tex. Crim. App. 1993). 
When specialized knowledge will assist the jury to understand the evidence or to
determine a fact at issue, the court may allow an expert to provide the jury
with the benefit of that knowledge.  Id.

We apply an abuse-of-discretion
standard in reviewing a trial court’s determination of a witness’s
qualifications as an expert and judgment regarding the admission of any expert
testimony.  Ellison v. State, 201 S.W.3d 714, 723 (Tex. Crim. App.
2006).  Absent a clear abuse of discretion, we will not disturb the trial
court’s decision to admit or exclude testimony.  Id.  A trial court
abuses its discretion when its decision lies outside the zone of reasonable
disagreement.  Casey v. State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

Cooper was a former five-year
employee of the Texas Attorney General’s Medicaid Fraud Control Unit and a
current investigator of fraud abuse in the Medicare system.  He investigated
Silver-Hawk and had worked on hundreds of investigations involving Medicare or
Medicaid fraud.  As part of his work, he often received training from the
medical review staff, who are nurses, regarding the regulations he had to
review and audit.  He testified it was true that, under the Medicare guidelines
contained in the 2002–2003 Medicare Supplier Manual, a patient who requires a
motor wheelchair usually is totally nonambulatory and has severe weakness of
the upper extremities due to a neurologic or muscular disease or condition. 
Based on his training, experience and qualifications, his understanding of the Medicare/Medicaid
guidelines for qualifying someone for a wheelchair or scooter, and after conversations
with Catalina T.’s daughter-in-law, granddaughter, and physician, he formed the
opinion Catalina did not qualify for a motorized wheelchair or scooter. 
Although Cooper gave similar opinions about other recipients, none of them were
persons for whom appellant had signed CMNs.

Bliese succeeded Cooper in
the Attorney General’s investigation of Silver-Hawk.  Bliese was familiar with
the standards for issuance of a wheelchair under the Medicare guidelines and
read to the jury the requirement that a patient usually be totally
nonambulatory and have severe weakness of the upper extremities.  During
interviews, Bliese observed the recipients to see whether they could walk and
observed the homes to see whether they could accommodate a wheelchair.  He also
talked with the recipient and sometimes with his or her physician.  He opined Chloe
G., Myrtle H., Rubie L., Jessie B., Lillie G., and Esther P. did not qualify
for a wheelchair under Medicare guidelines; Donald H. did not require a power
wheelchair; James H. did not need a wheelchair to move around in his house; and
Clarence B. did not require or need a wheelchair under Medicare guidelines.[40]  He also
concluded appellant’s having checked “unassisted” under ambulation for Valley
J. and Robert J. was inconsistent with her having authorized a power
wheelchair.

In sum, neither Cooper
nor Bliese gave an opinion regarding the “medical necessity” of a wheelchair or
a power wheelchair.[41] 
Instead, based on their knowledge of, and experience interpreting, Medicare
guidelines, they opined recipients did not qualify, or were not eligible, for
wheelchairs.  See United States v. Davis, 471 F.3d 783, 788–89 (7th Cir.
2006) (in prosecution for defrauding Indiana Medicaid, holding admissible testimony
of Indiana Medicaid employee who was expert in reimbursement for mental health
services regarding how Indiana Medicaid interpreted rule governing Medicaid
reimbursement for outpatient mental health services provided by psychologist
endorsed as health service provider in psychology); United States v. Gold,
743 F.2d 800, 816–17 (11th Cir. 1984) (holding chief and agent qualified as
expert witnesses on subject of scope of Medicare coverage for prosthetic
eyewear when (1) chief of health care financing agency’s coverage and
eligibility policy section had been working in Medicare for nine years and (2) health
and human services special agent had received special training concerning Medicare
and was three-year veteran of office of investigations in inspector general’s
office of health and human services).  We conclude the trial court did not
abuse its discretion in allowing Cooper and Bliese to testify about whether
recipients qualified for a wheelchair under Medicare guidelines.

Nevertheless, even if the
trial court abused its discretion, any resulting error did not affect
appellant’s substantial rights.  See Tex.
R. App. P. 44.2(b) (stating any nonconstitutional “error, defect,
irregularity, or variance that does not affect substantial rights must be
disregarded”).  We will conclude erroneous admission of evidence did not affect
substantial rights if, after examining the record as a whole, we have fair
assurance the error did not influence the jury or had only a slight effect.  Motilla
v. State, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).  In assessing the
likelihood the jury’s decision was adversely affected by the error, we should
consider everything in the record, including any testimony or physical evidence
admitted for the jury’s consideration, the nature of the evidence supporting
the verdict, the character of the alleged error and how it might be considered
in connection with other evidence in the case.  Id.  We may also
consider the jury instructions, the State’s theory, any defensive theories, and
whether the State emphasized the error.  See id.

For all of the recipients
discussed in Part V.C.2, above, about whom Cooper or Bliese expressed an
opinion, the jurors heard testimony from the recipient, a family member, or the
recipient’s physician, or the jury saw a video of the recipient.[42]  The jurors also
heard evidence about Medicare’s and Medicaid’s requirements for a power
wheelchair.  The court instructed the jurors they were “the exclusive judges of
the facts proved, of the credibility of the witnesses and the weight to be
given their testimony.”

In closing argument, the
state referred to the treating physicians as “experts,” and argued that “you’ve
heard the testimony of these doctors.  None of these wheelchairs were medically
necessary.”  The State, however, never mentioned Cooper or Bliese in closing.

Even if one assumes
admission of Cooper’s and Bliese’s opinions was error, admission of the
evidence did not affect appellant’s substantial rights and does not warrant
reversal.  For the preceding reasons, we overrule appellant’s fifth issue.

VII. 
Conclusion

            Having overruled
appellant’s five issues, we affirm the judgment.

 

 

 

                                                                                    

                                                                        /s/        Tracy
Christopher

                                                                                    Justice

 

 

 

Panel
consists of Justices Brown and Christopher and Senior Justice Mirabal (Mirabal,
J., dissenting).*

 

Publish
— Tex. R. App. P. 47.2(b).

_____________________

  * Senior
Justice Margaret Garner Mirabal sitting by assignment.









[1] We derive this conclusion
from the printed portions of the indictment rather than the handwritten changes
discussed below.





[2] It is not absolutely
clear Duhaime’s name was deleted.  Without objection, the State subsequently
arraigned appellant, alleging, inter alia, that she, while “a Medicaid
provider and Medicare provider appropriate[d], by acquiring or otherwise
exercising control over property; to wit, money, owned by Sharon Thompson and
Mark Porter, hereafter called the complainants, of the value of over $100,000
and under $200,000.”  Appellant does not complain of the deletion of Duhaime as
a complainant.





[3] This description of the
June 2 proceedings occurred at the hearing on appellant’s third motion for
continuance, discussed below.





[4] We present a brief
summary of the evidence here, with more detailed descriptions in the
discussions of sufficiency of the evidence and admission of opinion testimony,
below.





[5] According to the
testimony, persons receiving Medicaid benefits are “recipients”; and persons receiving
Medicare benefits are “beneficiaries.”  All persons, at a minimum, were
receiving Medicare benefits.  We refer to “Medicare beneficiaries” and
“wheelchair recipients.”





[6] Cathey Davis, an investigator
with the Medicaid Fraud Unit of the Texas Attorney General’s Office, testified
regarding interviews she conducted with recipients for whom Gottlieb had signed
the CMNs.





[7] In addition to appellant,
the defense called Sharon Thomas, who had been a State’s witness; Sunday
Nwosuocha, appellant’s husband; Cecelia Revila and Stephanie Alvarado, medical
assistants at appellant’s health clinic; Teresa Clemons, medical billing and
coding specialist at appellant’s clinic; and Ekwere A. Akpaffiong, a
pharmacist.





[8] The State also recalled
one of the investigators to authenticate an exhibit relevant to the rebuttal
testimony and called Cornelius Andrus, who testified that, on the
recommendation of his insurance agent, appellant came to Andrus’s home twice. 
She noted his medications and took his blood pressure, but never asked him
about a wheelchair.  An insurance agent subsequently visited him and obtained
information for an application for a wheelchair, which he received three weeks
later.





[9] At the time he testified,
Ekwere had pleaded guilty in federal court and was awaiting sentencing.





[10] Appellant also contends
denial of a continuance resulted in ineffective assistance of counsel.  Because
appellant asserts claims of ineffective assistance related to at least one of
her other stated issues, we discuss her claim of ineffective assistance
separately.





[11] We agree with our
dissenting colleague that judges “must be on guard against the tendency to
forget what it is like to be in the trenches as a trial attorney,” i.e., that
judges should temper the exercise of discretion with empathy.  Nevertheless,
when we review a trial court’s ruling for an abuse of discretion, the standard
is not whether we would have decided the matter differently than the trial
court.  See State v. Reina, 218 S.W.3d 247, 250 (Tex. App.—Houston [14th
Dist.] 2007, no pet.).  Rather, we adhere to the standard that there is no abuse
of discretion merely because a trial court decided a matter within its
discretionary authority differently than we would have in similar
circumstances.  Jensen v. State, 66 S.W.3d 528, 537 (Tex. App.—Houston
[14th Dist.] 2002, pet. ref’d).  

Also, absent lack of preparation or a complete denial
of counsel, we generally do not deem prejudice to an appellant.  See Rosales
v. State, 841 S.W.2d 368, 374–76 (Tex. Crim. App. 1992).  Thus, even when
circumstances may have resulted in counsel’s being less prepared than might
otherwise have been the case, we still require a showing of prejudice to
warrant reversal.  See id. at 375.  Review of the record in the present
case shows that counsel was prepared and thoroughly cross-examined every
witness, eliciting favorable testimony for his client. He also called seven
witnesses in his client’s defense.

 





[12] Appellant’s motion for
new trial, filed December 4, 2008, was overruled by operation of law.  See
Tex. R. App. P. 21.8.  Apart from
a statement in her second notice of appeal that the “motion for new trial was
presented for consideration/hearing on January 20, 2009,” there is nothing in
the record to indicate appellant presented the motion to the trial court.  If
presented January 20, 2009, it was not timely.  See Tex. R. App. P. 21.6 (“The defendant
must present the motion for new trial to the trial court within 10 days of
filing it, unless the trial court in its discretion permits it to be presented
and heard within 75 days from the date when the court imposes or suspends
sentence in open court.”).  Appellant, however, does not assign error to the
trial court’s not having held a hearing or not having ruled on the motion. 





[13] Appellant stated only
the following:

The
importance of the expert witnesses is seen in the trial presentation. The State
of Texas was able to present at least ten to fifteen physician [sic] who
proffered opinion [sic] on a number of subject matters related to the medical
profession, Medicare/Medicaid, and/or medical procedures that only an expert would
be able to refute.





[14] In her motion for new
trial, appellant referred to attachments showing post-hurricane attempts to
contact Avery.  Those attachments are not part of the appellate record.





[15] Because the State did
not call the witness in its case-in-chief, it arguably was not required to
provide notice of the witness.  See Tex.
R. Evid. 404(b) (regarding admissibility of extraneous offense evidence
“provided that upon timely request by the accused in a criminal case,
reasonable notice is given in advance of trial of intent to introduce in the
State’s case-in-chief such evidence other than that arising in the same
transaction”).





[16] At the hearing, counsel
stated:

I’ve
been able to locate most of the file because it had been set aside upstairs
because it was a current and pending trial file.  Some of the file was in the
file drawer, which included my theory of the case, as well as my workup with my
notes in terms of when I was ready for trial last time.

That
file, as well as another folder, I located one portion of the file. It was
water damaged and we’re trying to dry that file out to copy, in addition to the
other file I’ve not been able to locate.





[17]
Specifically, appellant contends:

 

The State proceeded to trial
on an amended indictment that was not properly amended; all proof associated
with the Medicare claim was without effect in that the claims were not properly
before the court.  Counsel was ineffective for the failure to object, such
ineffectiveness was caused by the court’s denial of the motion for continuance.

Appellant’s second issue is multifarious.  See Stults
v. State, 23 S.W.3d 198, 205 (Tex. App.—Houston [14th Dist.] 2000, pet.
ref’d) (“A multifarious point is one that embraces more than one specific
ground.”).  We may disregard and refuse to review multifarious
points.  Id.  Nevertheless, to the extent we are able to identify appellant’s
complaints in her second issue with reasonable certainty, we will consider
them.  See id.  We consider the claims of ineffective assistance and
insufficient evidence in Parts IV and V, respectively.





[18] Although the charge on
which appellant was arraigned may differ from the amended indictment in that it
does not list Duhaime as a complainant, appellant does not assign error to
Duhaime’s omission.  See note 2 above.





[19] Appellant states “the
deficiency of counsel is also seen” in issue three, in which she contends the
evidence was insufficient as a matter of law to show a Medicaid loss of
$200,000.  Appellant does not explain how counsel was deficient in relation to
issue three.





[20] In issue three,
appellant argues, “The evidence was insufficient as a matter of law; the State
failed to prove a two hundred thousand dollars ($200,000.00) Medicaid lost
[sic].”  In issue four, appellant argues, “The evidence was insufficient to
support the jury’s finding of conspiracy to commit aggregate theft.”





[21] The offense allegedly
occurred between March 3, 2002, and June 3, 2003.  Although the legislature
subsequently amended section 71.02(a), it made no substantive changes relevant
to the charge in the present case.





[22] In Jarnigan, the
defendant was charged with having committed theft, rather than conspiring to
commit theft.  See Jarnigan v. State, 57 S.W.3d 76, 80 (Tex.
App.—Houston [14th Dist.] 2001, pet. ref’d).  The case on which Jarnigan
relies is Barber v. State, 764 S.W.2d 232 (Tex. Crim. App. 1988).  In Barber,
the defendant was charged with “conspiring to commit” the offense in question. 
See id. at 234.  In addition to Jarnigan, this court has cited Barber
for the two requirements in the following cases:  Gonzalez v. State, 63
S.W.3d 865, 869 (Tex. App.—Houston [14th Dist.] 2001), aff’d on other
grounds, 117 S.W.3d 831 (Tex. Crim. App. 2003), and Tu v. State, 61
S.W.3d 38 (Tex. App.—Houston [14th Dist.] 2001, pet. ref’d). 
Like the present case, neither were “conspiring to commit” cases.





[23] In this court, appellant
refers only to two jury questions to conclude the evidence was insufficient to
show three or more persons were acting together.  In the first question, the
jury inquired whether it was necessary to find appellant acted in combination
with all five of the alleged coparticipants, and the court referred the jury to
the charge.  In the second question, which related to a lesser included
offense, the jury inquired whether Bibian was listed as the representative of
Silver-Hawk or as an individual, and the court responded she was listed as an
individual.





[24] The deposits ranged from
$970.00 to $4,900.00.





[25] Because we conclude the
evidence was sufficient to establish the amount of loss based solely on the
actions of appellant in combination with Bibian and Achor, we need not address
appellant’s contention there was insufficient evidence to show appellant acted
in combination, or had an agreement, with Gottlieb or Herpin.





[26] Silver-Hawk received a
total of $150,306.48 based on thirty-two CMNs containing appellant’s unique
physician identification number.  Appellant admits signing CMNs, and had
records, for twenty-nine patients.  Silver-Hawk received a total of $135,605.36
for equipment for these twenty-nine patients.  There is specific evidence
appellant falsified information on the CMNs for twenty-three of these
twenty-nine patients.





[27] As discussed below, the
investigators were also asked their opinions about whether certain recipients
qualified for a power wheelchair.  Appellant challenges the admissibility of
this opinion testimony in issue five.  In considering the sufficiency of the
evidence, however, we may consider this testimony regardless of whether it was
properly admitted.  See Garcia v. State, 919 S.W.2d 370, 378 (Tex. Crim.
App. 1994).





[28] To protect the
recipients’ privacy, we refer to them by their first names and last initials.





[29] Bliese testified
Medicaid incurred the loss.  The documentary evidence, however, shows a
Medicare, not a Medicaid, loss.





[30] One of the men was
Jessie F.  Appellant denied treating him and stated that the CMN for Jessie F.
was forged.





[31] During his testimony,
James H. referred to the person in Houston as “he,” but also stated it was a
long time ago and it was hard to remember.





[32] The CMN in Catalina T.’s
record did not contain the patient’s name or address.





[33] Robert J. described the
three women involved as “American” and could not remember their skin color.





[34] In the interest of time,
the State did not play this tape, but allowed that, if the jurors wanted to see
it later, they could play it.





[35] Section C is a narrative
description of the equipment being ordered and the cost.





[36] These eight CMNs,
discussed above, were for Chloe G., Robert J., Valley J., Jessie B., Clarence
B., Lillie G., Esther P., and Sadie G.





[37] Although appellant cites
legal authority, she provides no record citations to support this argument.





[38] In addition to the
recipients discussed in Part V.C.2., above, Bliese interviewed Jessie F. and
Nimat A.  Appellant did not produce a file for Jessie F. and denied signing the
CMN.  No Medicare or Medicaid loss was attributable to Nimat A.





[39] In four instances,
Bliese used the phrases “did not require” “did not need,” “did not appear to
need,” and “was not eligible.”  When asked whether one recipient “need[ed] a
wheelchair to get around in his residence,” Bliese responded, “No.”  Bliese
also opined, over objection, that it was inconsistent to have checked “unassisted”
for ambulation and have issued a power wheelchair.





[40] Bliese also opined
Darnell D. was “not eligible” for a wheelchair.  Appellant did not sign
Darnell’s CMN.





[41] Appellant relies on Calvo
v. State, No. 02-05-00107-CR, 2006 WL 1174211 (Tex. App.—Fort Worth Sept.
13, 2006, pet. ref’d) (mem. op) (not designated for publication).  As an
unpublished criminal case, it is without precedential value.  Tex. R. App. P. 47.7(a).





[42] This statement is also
true for all but four of the total number of recipients about whom Cooper and
Bliese gave opinions.  The CMNs for these four exceptions were signed by Drs.
Kushwaha and Gottlieb.